THOMPSON *vs.* QUIMBY.

*In the matter of proving the last will and testament of* ABRAHAM G. THOMPSON, *deceased.*

THE will contained a clause disposing of certain assets according to the terms of a schedule, but was executed without the schedule being annexed,—Held that, whether the schedule was annexed or not, the will was validly executed, having been signed at the *end* of those testamentary provisions which the decedent intended to incorporate in it.

Mere speculative belief does not, of itself, afford a clear test of insanity. A will impeached on the ground of incapacity and undue influence, admitted to probate—there being no sufficient evidence of delusion, fraud, or imposition,—the provisions of the will according with the decedent's intentions otherwise expressed,—and the instrument having been prepared with care and deliberation.

The following is a copy of the will propounded.

"I, Abraham G. Thompson, of the city of New-York, merchant, knowing the uncertainty of human life, and that it is allotted unto all men to die, and being desirous of disposing of my worldly estate, do make, publish, and declare this to be my last will and testament—hereby revoking and declaring null and void, all and every will or wills by me previously made.

"*First*, I direct my executors, hereinafter named, to pay all my debts owing at the time of my decease, and which at the present time are few and inconsiderable; and I desire that my body may be decently interred in the family burying-ground at Islip, Long Island, and that a suitable monument be erected over my grave, similar in appearance and design, and equal in value, to that erected

29

over the remains of my deceased brother, Jonathan Thompson. And I hereby appropriate out of my estate the sum of one thousand dollars to defray my funeral expenses and the expenses of such monument; and it is my will that the arrangement of my funeral and burial, and the procuring of such monument, shall be under the direction and management of my nephew, Abraham G. Thompson, jun.; and I direct my executors to pay over to him the said sum of one thousand dollars for the defraying of the expenses thereof. But if it shall so happen that such sum of one thousand dollars is insufficient for the purposes aforesaid, my executors may, in their discretion, add thereto such further sum as may be necessary.

"*Second,* I give and bequeath unto each of my nephews and nieces, sons and daughters of my deceased brother, Jonathan Thompson, five hundred dollars: that is, five hundred dollars to each nephew and five hundred dollars to each niece. I also give and bequeath five hundred dollars to my half-sister, Julia Carll. Also, two hundred and fifty dollars to Sarah Howard, daughter of my deceased half-sister, Mary. Also, two hundred and fifty dollars to my nephew, Timothy G. Carll. To Fila Hunt I give and bequeath fifteen hundred dollars; and also five hundred dollars in cash to her daughter, Catherine Knight. I give and bequeath to Daniel T. Cox, the sum of one thousand dollars, upon the express condition, however, that he accepts the same within ninety days after the day of my decease, in full satisfaction of all claims he may have on my estate. Also, I give and bequeath to my friend, William A. Smith, five hundred dollars, and to my young friend, Henry Nash, five hundred dollars. I give and bequeath to my nephew, Abraham G. Thompson, jun. (my namesake), son of my deceased brother, Jonathan Thompson, my gold watch and the gold key given to me by Thomas Richards, to be kept by him in remembrance of me. I also give and bequeath to my nephew, David

Thompson, son of my brother, Jonathan, the further sum of three thousand dollars. I also give and bequeath to my nephew, Abraham G. Thompson, jun., the further sum of one thousand dollars; and when and so soon as he shall have attended to my funeral and caused the monument to be erected, with a suitable inscription thereon, to the satisfaction of two or more of my executors, I then give and bequeath to the said Abraham G. Thompson, jun., the further sum of two thousand dollars. And if, for any cause, the said Abraham G. Thompson, jun., shall not attend to said funeral and the erection of said monument, I desire that some one of my executors shall attend to the same; and I give to such executor who may take upon himself that duty, the sum of two hundred and fifty dollars, as a compensation for that particular duty. I also give and bequeath to my nephew, George W. Thompson, son of my brother, Jonathan, the further sum of two thousand dollars. I give and bequeath to my grand-daughter, Cornelia, and also to my daughter-in-law, widow of my deceased son, Edward, the sum of one hundred dollars each; and I limit this amount because they have a large property under the will of my deceased son, and because the husband of my said grand-daughter demands from me, as executor, the full legal interest on such property while it has been in my hands as executor, and which interest thus demanded is much more than I have received for the same.

"I give and bequeath unto my executors and trustees, hereinafter named, and to such of them as shall take upon themselves the duty of executing the trusts of this my will, and the survivors and survivor of them, the sum of fifteen thousand dollars, in trust, to receive the income thereof, and to accumulate the same for the use of my grandson, Edward, son of my deceased son, Edward G. Thompson, until he shall arrive at the age of twenty-one years; and thereafter to pay the annual income of said accumulated

fund to him during his natural life, and at his decease to pay over the principal or remainder thereof to such children or descendants as he may leave him surviving, to be divided among them according to the laws of the State of New York, or to such of them as he may by his last will appoint. But if the said Edward shall die leaving no child or lineal descendant, then it is my will that said fifteen thousand dollars, and the accumulation thereof, shall at his death fall in and become a part of my residuary estate, and be disposed of as hereinafter provided for the disposition of such residuary estate. But my wish is, that my said grandson, Edward, who is now of an age which entitles him to apply for the appointment of a guardian, shall, when he so applies, make application for the appointment as such guardian, I having heretofore been his guardian by his father's appointment, of either David Thompson, George W. Thompson, Francis Griffin, who are named as executors in his father's will and also in this my will, or of William W. Campbell, also one of my executors, or of Joseph Sampson, one of his father's executors, or of Samuel W. Gold, of Connecticut, at whose school the said Edward is now a student.

" It is my earnest wish that Joseph Sampson, who was the partner of my deceased son, Edward, and Francis Griffin, Esq., who was his school-mate and friend, and David Thompson and George W. Thompson, all of whom are named executors in his will, would, after my decease, or at least some one or more of them, qualify as such executors, and take upon themselves the duties thereof; and in that event, I request and direct my executors to pay over to the said executors of my deceased son, or either of them, all moneys hereinbefore given to my executors in trust for my said grandson.

" And in case such executors or executor of my son qualify and agree to act, then I give and bequeath unto them or him, the said sum of fifteen thousand dollars, in

trust, for the benefit of my grandson, Edward, to be held by the said executors or executor of my son, upon the same trusts and conditions as hereinbefore expressed and provided for my own executors.

"I give and devise to my grandson, Edward G. Thompson, all my right, title, and interest as tenant in common with the heirs of my late brother, Jonathan Thompson, in and to the family burying-ground at Islip, Long Island, and the road leading thereto, and the land surrounding said burying-ground, as the same was conveyed to me by my said brother, Jonathan, the same to be held by my said grandson and used as now, as a family burying-ground. And it is my will, that he never sell or dispose of the same, except to his own children or descendants, or to some one or more of the sons of my late brother, Jonathan Thompson.

"I give and devise to each of my executors who, within six months after my decease, may qualify as such executors, the sum of two hundred dollars each, in addition to their legal fees and charges.

"All such household furniture, jewelry, chemical and other apparatus, which is specified or enumerated in a certain schedule accompanying this my will and which is signed by me, I give and dispose of to the respective parties named in said schedule, and in the proportion as therein designated.

"I authorize and direct my executors to sell at public auction or otherwise, the pew which I own in the Brick Church in this city, and which cost me four hundred dollars; and to pay over the proceeds of such sale to the Rev. Dr. Spring, the pastor, to be by him distributed among the poor of the church, in such manner as he may think best.

"All the rest, residue, and remainder of my estate, real and personal, I give, devise, and bequeath, unto my executors, and trustees hereafter-named, and to such of them as

shall take upon themselves the execution of the trusts of this my will, and the survivors and survivor of them, in trust, to sell and convey my real estate, and to sell and dispose of my personal estate, except, it is my will that the real estate which I own in Rockland county, shall not be sold by my executors until a certain lease given by me to Henry Sheldon, James Freeland, and William S. Pearson, shall expire or be cancelled. And having converted said real and personal estate into money, then to distribute and divide such residue and remainder of my estate as follows : I direct said residuary estate to be divided into thirty-two equal parts or shares ; I give and bequeath six of said parts or shares to the American Bible Society ; I give and bequeath five of said parts or shares to the American Tract Society ; I give and bequeath five of said parts or shares to the American Seamen's Friend Society, and if the said last-mentioned Society is not incorporated at the time of my decease, I then give and bequeath such five parts or shares to the person who may at that time be the treasurer of the American Seamen's Friend Society, for the use of said Society. I give and bequeath three of such parts or shares to the person who may at the time of my death be the treasurer of the Central American Education Society in the city of New York, for the use of said Society. I give and bequeath four of such parts or shares to the American Colonization Society. I give and bequeath four of such parts or shares to the American Home Missionary Society, or if such Society is not incorporated at the time of my death, then I give and bequeath such four parts or shares to the person who may at the time of my decease be the treasurer of the American Home Missionary Society, for the use of said Society. I give and bequeath to the person who at the time of my death may be the treasurer of the American Board of Commissioners of Foreign Missions, three of such parts or shares, for the use of said society. I give and bequeath one of such parts or shares to the New-

York Institution for the Instruction of the Deaf and Dumb. I give and bequeath one of such parts or shares to the New-York Institution for the Blind.

"If any of the above institutions or societies are not incorporated, then I give and bequeath the parts or shares designated for their use, to the treasurer or other officer for the time being appointed by the respective institutions or societies to receive legacies and gifts; and if there is any mistake made by me in the names of any of the institutions or societies, it is my will that the legacies shall not lapse, but that my executors shall pay the same to the institutions or societies intended and indicated by me. But if for any reason any such legacy should lapse, then it is my will that such legacy or legacies should be divided among the other remaining institutions and societies herein mentioned, in equal proportions; and I give and bequeath the same to said other institutions and societies, share and share alike. It is my will that the parts or shares of my estate given to the American Seamen's Friend Society, be used and applied in the purchase and distribution among sailors going to sea, of religious books. It is my earnest desire that my grandson Edward and my grand-daughter Cornelia, be made life members or life directors of the various societies and institutions to whom I have above given legacies, when the regulations of such societies and institutions will allow and the legacy is sufficient to warrant the same.

"I authorize my executors and trustees, in their discretion, to refer and submit any matter in difference arising in relation to my estate and affairs, to arbitration, in the usual manner; and also to compromise and compound any debt due or which may become due to my estate, or any matter in difference arising in relation to my affairs or estate, and to extend time for payment according to their discretion; and in all cases to act by attorney, duly authorized and appointed in writing for that purpose, in the execution of the trusts and powers hereby created and conferred.

" I authorize my said trustees under this will, to invest the trust moneys belonging to each of the trusts hereby created, in bond and mortgage, or in the public stocks of the State of New York, or of the United States, or in the stock of the New-York Life Insurance and Trust Company, or to deposit the same with said Company, and to change such investments, and re-invest the same in their discretion.

" All the powers, authority, and discretion, estates and trusts, hereby given to my executors and trustees, I do hereby give to such of them as shall take upon themselves the execution of this will, and to the major part of them, and to the survivors and survivor of them ; and neither of them shall be responsible for the default or misconduct of the other of them, but only for his own wilful misconduct or default.

" And I do hereby nominate, constitute, and appoint my said nephews, David Thompson and George W. Thompson, and my friends, Francis Griffin and William W. Campbell, of the city of New York, and Thomas Baylis, Henry Sheldon, and James Freeland, of the city of Brooklyn, to be the trustees and executors of this my last will and testament.

" In witness whereof, I have hereunto set my hand and seal, this twenty-seventh day of October, in the year one thousand eight hundred and fifty-one.

" A. G. THOMPSON."    [L. s.]

J. LAROCQUE *and* D. LORD, *for Executors.*

I. The decedent, at the time of making his will, was in as full and perfect capacity as at any time of his life. No change to derangement is shown. See *Mudway* vs. *Croft*, 3 *Curteis*, 671 ; 7 *Eng. Com. Law R.*, 549. *Chambers* vs. *Queen's Proctor*, 2 *Curteis*, 415 ; 7 *Eng. Com. Law R.*, 163.

II.   The singularities of the decedent were instances of credulity and superstition prevailing from his earliest life, and were not acts of delusion and violations of common sense.   Mere credulity and superstition, especially when derived from the traditions of early life, and in relation to subjects not palpable to the senses, do not prove delusion.

III.   The singularities of the decedent were limited in range, and never were acted out in relation to his property or his relatives.   His business was always prudently and well conducted.   His domestic affections were in no degree inverted.   His motives for the dispositions of his will are not irrational.   See *Dew* vs. *Clark*, 3 *Add.* 79 ; 2 *Eng. Com. Law R.*, 436.

IV.   There is no evidence to sustain any imputation that the will was affected by his singularities.

V.   There is no evidence of undue influence in the procurement of the will.

VI.   The will, in its preparation and in its contents, is full proof of his capacity to make it.   (*Cartwright* vs. *Cartwright*, 1 *Phil.*, 90.)

---

CLEMENT D. NEWMAN, WM. FULLERTON, *and* CHAS. O'CONOR, *for Contestants.*

I.   The paper offered for probate is not the will of the decedent.   It is in an inchoate state, in the absence of the schedule referred to in the body of the will, and which was to have been signed and attached thereto as a part of the instrument.

The property named in the schedule falls into the residuum of the estate, and goes to the charitable institutions named in the will.

As to this property the will of the testator was defeated.

II.   Considering the state of the decedent's mind, he was the subject of an undue influence at the time of the preparation and execution of the will.

The undue influence may not have been sufficient of itself to defeat the will, but it becomes important in this case to consider its nature, tendency, and effects in connection with the decedent's insanity.

III. The decedent was laboring under delusions amounting to insanity, and had not a disposing mind, during the preparation or at the time of the execution of the will. (*Waring* vs. *Waring*, 10 *Jurist. Dew* vs. *Clark*, 3 *Addams*, 79.)

THE SURROGATE. The probate of the will of the decedent is contested on the grounds of invalid execution, insufficient testamentary capacity, and undue influence.

I. By a clause in the will, the following provision is made: "All such household furniture, jewelry, chemical and other apparatus, which is specified or enumerated in a certain schedule accompanying this my will and which is signed by me, I give and dispose of to the respective parties named in said schedule, and in the proportion as therein designated."

The statute requires the will to be signed by the testator, and attested by the subscribing witnesses *at the end.* It appears that the schedule referred to in the will, was not attached to the instrument at the time of execution, or subsequently. Something was said concerning it when the decedent was about signing the will, and the idea was advanced that it might be annexed afterwards; but the proceeding was not interrupted, and he called on the witnesses to attest, and declared the instrument to be his will, notwithstanding the schedule was not ready. I cannot perceive that it would have made any difference, whether the schedule was attached to the will or not. In either case, unless executed and attested as a will, it could have no testamentary character. Reference may be made in a will to another document, for purposes of description, but there can be no valid testamentary dispositions unless contained in

the will; and the testator cannot in his will reserve the power of giving, or declare that he does give, by an instrument not formally executed according to the provisions of the statute. The schedule it was proposed to attach to the will, as well as the clause in the will referring to it, would consequently have been void, even had the schedule been annexed. The failure of that provision would not, however, have avoided the entire will. The schedule was not designed to be an integral part of the will, but only to be an appendant. All that was intended to be in the will was in it. The instrument itself was complete and perfect, was declared by the decedent to be his last will and testament, and was signed and attested as such at the end. Notwithstanding one of its provisions looked to another instrument and other gifts, that circumstance did not affect the integrity of the will as a complete act then accomplished. The document itself received all the solemnities designed to be performed, and requisite to the due execution of a will; and the appending of a schedule intended to effectuate the objects of one of the clauses, or the failure to append it, could, I think, have no effect upon the question of the due execution of what was at the time signed, declared, and attested as the last will. Independently of this view, there is enough in the evidence to show that the intention in respect to the schedule, so far as it had been proposed to execute it at that time as a supplement to the transaction then consummated, was for the time at least, waived or abandoned. The will was executed without it.

II. I shall, in the next place, proceed to consider the evidence adduced to establish the decedent's insanity.

Born in the county of Suffolk, Mr. Thompson was for some years engaged in business in the town of Islip, and then came to the city of New-York, where he continued to reside for nearly half a century, and died at the age of 75, having amassed a large fortune, amounting nearly to three hundred thousand dollars.

His only son, Edward, died in the year 1835, leaving a

widow and three children, Edward, Augustus, and Cornelia. By his will he constituted his father, the decedent, a trustee of his estate for the benefit of his family. Augustus died under age: Cornelia was married in 1848 to Thomas R. Quimby. She and her brother Edward, who is still a minor, contest their grandfather's will.

The decedent made three wills. By one executed August 31, 1850, Abijah Mann, jun., acting as his counsel, after legacies amounting in the aggregate to $26,500, to several friends and relatives, he gave $10,000 in trust for his grand-daughter, Mrs. Quimby, and the residue of his estate in trust for his grandson, Edward—, during life, with remainder to their issue.

On the 13th of May, 1851, by another will, William W. Campbell acting as his counsel, after several legacies to friends and relatives, amounting in the aggregate to ten thousand dollars, he gave five thousand dollars in trust for Mrs. Quimby, twenty thousand dollars in trust for Edward,—during life,—and the residue of his estate in trust for various benevolent and religious institutions.

On the 27th day of October, 1851, two days before his death, he executed the will propounded for probate, by which he left sundry legacies, amounting to $15,250; gave his grand-daughter, Cornelia, and her mother, $100 each; his grandson, Edward, $15,000, in trust during life; and the remainder to religious and charitable institutions.

It is contended that at the time of the execution of this last instrument Mr. Thompson was not of sound mind. The evidence offered to impeach his sanity runs back through a long series of years.

Solomon Davis, employed by him as a coachman and in other capacities, lived with him twenty-two years before his death for about two years, and subsequently at various intervals, from one to four months at a time. He says, " I have lived with him sixteen times, off and on. . . . He was a curious man, and had curious habits. . . . He gave me a book to read, called Francis Barrett;

a book to work spells, cure fever and ague, and raise
spirits. He then said he knew a place at Montauk where
Kidd's money was buried; that he had been on there with
an old man he took up, and had a rod that would attract
to the money. That he got a man at Sag-Harbor named
David Mulford. He acted as rodsman. It did not work
well in the old man's hands, because Mulford had more of
the Water of Life in him. I asked him why Mulford had
more than other men, whether it was because he was a
bigger man, because of his size? He said, No, it was be-
cause he drank more rum. He said Mulford took the rod
in his hands, and it worked well, and he found where the
deposit was, struck a crowbar down on it, and it sounded;
formed his ring and commenced digging. Just as he
broke the turf, there was a great black and white spotted
bull came running over the hill, throwing his tail as if he
had the wattles in his back in the spring of the year. The
wattles is a kind of fly. The bull pawed and hoofed the
dirt, he said, as if he was mad. There were nearly a thou-
sand cattle, he said, that came and passed diagonally over
another hill opposite, which acted just like that bull. He
said the bull looked to him as big as a mountain. I said,
A small mountain, I suppose. He said, Well, it was as big
a bull as ever I saw. He said, when the cattle were pass-
ing so, Mulford said with an oath, ' By God, we have got
it.' Whereupon the cattle all stopped, and went feeding
quietly. After that, the crowbar dropped or sunk down
into the earth as it stood, nearly a foot. That he, Thomp-
son, told them to let the crowbar stand, till he dug to see
what stopped it. Previous to this he said Mulford's speak-
ing broke the spell. He did not say what made Mulford
speak. He said he dug till he got to the point of the
crowbar, shoving off the earth, and examining and hand-
ling it all over to see what stopped the crowbar, before
Mulford spoke; and he found a little piece of mother-of-
pearl fan (which he showed to me), at the point of the

crowbar in the earth.   This was pretty much the whole of that story ; he has repeated it to me at various times ; and that was what made me think he was a curious man.

"He said at another time that he had been back to the same place, Fort Pond Bay, at Montauk point, with old Mr. Brower.   Brower made a needle.   Sullivan Moulton went along also.   That same Brower took along an old bull-b...h, as he expressed himself.   They carried down a pail of water to drink, from the house.   They centered the spot where the treasure was, again, began operations, and the old b...h went and lapped in the water ; Moulton stepped up and gave her a kick, and said, 'Get away, you cursed b...h ;' and that broke the spell at that time ; they could do no more.   He said, in the account he gave me of the first visit, that no one was to speak during the operation.   He told me a great many such things ; I would sit here a week, if I were to repeat all of them.   I lived with him about two years in Beekman street.   It is about twenty-one years ago last April, I think, when he moved to William street.   I was living with him when he moved.   .   .   . We had moved about half the furniture out of the Beekman-street house.   He told me to go to the stable, and get a wrench to take his plate off the door.   I came in the back way through the basement, up the back stairs into the hall, and met him about half way ; and he took the wrench out of my hands to unscrew the plate.   I turned, and had just got down the stairs a bit, when I heard him screech out as if something had hurt him.   I ran to his assistance ; and he was lying partly on the floor, the wrench in one hand, and holding himself up with the other.   He said, when he began to unscrew the plate, some very strong thing hugged him—it must have been a ghost—it gave him a squeeze like a bear.   I took him down, led him down to the William-street house ; and he said the Beekman-street house was haunted, and he would never go into it again for all New York.   .   .   .   .   .   .   He

sent me once up to Leyden,—it is something like twelve years ago,—to buy a pair of horses for him. I bought a pair in Lowville,—blood bays. . . I brought the horses home, and put them in the stable. As I sat in the stable, holding up my foot, which I had hurt, he came into the stable, talking to himself. He did not see me. Said he, 'There are the very same horses Mrs. Hunt dreamed about, —little ears, stick right out sharp,—almost as red as blood, —and the jaws go as quick as a pair of tailor's shears,— head up high,—rainbow necks, natural tails, long manes. No,' said he, 'I will never ride after them.' Then I spoke, and said, 'Why, Mr. Thompson?' He started back, and said, 'What! you there, Solomon?' I said, 'Yes.' He asked me if I was well. I replied yes, and asked him how he was. He answered, all very well, but his head hurt him—putting his hand to his head; his heart was right, and his body was right, but his head hurted. He had the head-ache. Then I asked him why he would not ride after the horses, and talked with him a good while before he would tell me. Finally he said he had seen an old horse over at Mr. Post's that would answer his purpose better than young ones. Finally he said, after some argument and persuasion, 'Mrs. Hunt has dreamed a dream since you have been gone. 'You know, Solomon—(he always called me Solomon)—that when Mrs. Hunt dreams, she dreams right.' I said, 'Mr. Thompson, anybody will dream right, when they dream awake.' The old gentleman was quite angry with me. He said, 'She dreamed that just such horses as those you brought home,—she described them exactly—she dreamed that you hitched them before my little pocket-book carriage. You drove. I got in behind. You ran down one of the North-River streets, hove me out, killed me, tore me all to pieces, and the blood was all over the street.' He swapped the horses away with Post, and took an old horse for this span, and gave fifty dollars to boot. The horse was not worth ten

dollars, for a gentleman. I gave $180 for the team, and it cost me $50 to get them here. They were worth $400 in New York. He never rode after them. He sold them to Post the same day of the conversation I had with him in the stable." . . . . "He said he had the receipt and all the ingredients to make [the philosopher's stone], except one,—that was the water of life. He must line a room with white Irish linen to get that,—and must get a man in there, and keep him drunk six months on strong beer, or London porter, which was better; at the end of that six months ... ..... would be the water of life, and he could complete the philosopher's stone; and with that he could know what every person was about, in the earth, under the earth, and in heaven. He said this a great many times. The last time he said it was about nine years ago. He said the philosopher's stone would enable him to do anything he wanted to do; to see all the treasures of the earth; to go to Heaven, and see what they were doing there; and come back again to the earth, and see all that was doing here, and all the mines and treasures hid in the earth. He said he had once fixed a room with Irish linen, and put Dr. C. in it to talk with the spirits, to get the ingredients for the philosopher's stone; and he got the receipt, but not the ingredients, from Dr. C. He said he had forty wax candles to burn in the room while the operator was at work. It cost a good deal. He never told me where the room was. I don't know that he had a room fixed up anywhere. . . He told me J. D.'s girls could see treasures in the earth, by looking in glasses. . . He said some had stones they could see in. He had a stone he could see in. He could see landscapes at a distance; that when he got his philosopher's stone completed, he should not want any of them, because he could then see more distinctly. I drove him to D.'s a good many times. The girls looked in glasses for him, trying to see treasures in the earth—minerals and mines. I heard him say to them, he

wanted them to look in the glasses to see if they saw a deposit of money on Red-Hook. They said they saw it. He said he would go some time and get it. This was as much as 18 or 19 years ago. He never said he had any books to raise spirits, except the book, 'Francis Barrett.' He said he could raise spirits and lay them with that book, and cure all kinds of diseases with receipts and charms in that book." The witness also stated that Mr. Thompson had a mineral rod; buried a purse of gold at Red-Hook, and it was found by a man who used the rod, twice out of three times. He sent Davis to Philadelphia for a man named J. R., to come to New York and make him a mineral needle. The needle was to be "one-third pure silver, one-third bismuth, and one-third white copper," and "was to attract gold and silver hid under the ground." Mr. Thompson paid $50 for the receipt for making it, and attempted to make a needle in his laboratory. He kept Davis rubbing a "magnet he had made" three hours every day, and this was to be continued 25 days before it would be of any use. This was about eight years before his decease. He said he had been to Providence to consult a clairvoyant, and that she described his house and its arrangements with perfect truth. He consulted a clairvoyant in this city, and said she told him where the Kidd treasure was. He pretended to show Davis spirits in the moon and sky; said "they were spirits of the air,—some lived in the moon, and some in the sky." "He would point and say, 'There, don't you see them?' and I would say, I did not know but I saw them, to get rid of him the easiest way I could."

Mrs. Mather became acquainted with the decedent about nine years before his decease, and was in the habit of seeing him quite frequently. She invented the submarine telescope, and he called upon her to examine it. The acquaintance, commenced in this way, continued until the spring prior to his death. At the first interview, he

30

stated that he wished to see if her telescope could be used to find Kidd's money. He subsequently discoursed with her in respect to treasures, clairvoyants, glass-lookers, enchantment, spirits, mineral rods, needles, and the philosopher's stone,—said that he had a house set apart and a man consecrated for the purpose of procuring the philosopher's stone, and described the method, substantially as stated by Solomon Davis, with some additions and variations. He claimed to command the planetary spirits, and described their influence over particular days. "He said the philosopher's stone would cure all diseases, prolong life to any age, transmute metals into gold; when teeth had been lost through old age, a little of it put into the gums would bring out new teeth. With it he could see into futurity or anywhere else. . . . That by means of it he could see anything in heaven or under the earth." . . . "He told how some mineral rods were made; he said he could hold them in his hands, and they would answer questions, bowing towards him to say Yes; they would attract to any hidden treasure under the earth." He described the method of making them, which consisted in mixing certain metals and herbs at particular hours and days, putting them into a hollow bone or quill, and placing them in the Bible, "at some particular chapter, where they lay a certain time, and then they were ready for use; but at the same time more or less enchantment would get upon them." The last time but one the witness saw him, "he said that he wanted to get a glass to lay over the eyes of some person, about the time the breath left the body, who was born under the same planet he was, and then he could see anything he desired. It must lie on the eyes of the corpse several days; and then the spirit of the deceased person would be so concentrated in the glass, that he could see anything he desired in the spiritual or material world." . . . "In the summer, . . after he had been sick, he told me that because he had burst the bonds of human

nature and explored the spiritual world, that the spirits tormented him when he was sick, were all around him, and were paying him off for what he had done; they would come upon him when they were not called for, and would alarm him. He could see them better when his eyes were shut than when they were open. He said every body had three eyes, one spiritual and two temporal. The spiritual eye lay between the other two over the nose." He told the witness that he consulted clairvoyants on business affairs, wore charms and talismans; and that he would live nearly a thousand years. The last time she saw him at the top of the hill in Columbia street, Brooklyn, he said he would live to see it levelled.

I have stated the evidence of these two witnesses with particularity, for the purpose of comparison with the other testimony in the case.

Dr. Kuypers, his attending physician, states, that he mentioned to him that he had discovered the curative effects of sulphur in rheumatism. During his last illness he spoke about mineral rods and Kidd's treasures, the cure of fever and ague by wearing a piece of paper with certain words written on it; and told him the story about digging for Kidd's money, and the appearance of the bull; but he never conversed with him in respect to raising spirits, seeing spirits in the moon, having been attacked by a ghost, wearing talismans, or knowing any means by which he could protract life to a very great age.

Kinney, who was his coachman for about two months in the fall of 1849, states that when he asked him for some black lead for the harness, Mr. Thompson inquired how he would know whether it was good, saying, "If you put it in your mouth, and chew it, and eat it, you would then know whether it was good or not." . . . . He adds, "He told me one day, he had a whistle—he made me in dread on that day—that he had a whistle; and anything he

wanted he would get it, when he whistled with that whistle."

To Dr. Gold, the preceptor of his grandson, Edward, he communicated his specific for the rheumatism.

To Mr. McAllister, who mesmerized him for pain in the head, he stated that he derived great benefit from it. He also showed him one of his mineral needles, which he said would point to silver.

Mr. Mann, his counsel, states that he was aware of his peculiarities in relation to supernatural agencies and influences, clairvoyance, hazel-rods, and Mesmerism; that Mr. Thompson often spoke with him on these subjects; stated that he knew the contents of the Kidd ship just as well as if he had counted it; that he had searched for Kidd's money on Gardiner's Island. "He discovered," says Mr. Mann, "that I had no faith; saying, Mesmerism don't exist without faith." He experimented with the hazel-rod in Mr. Mann's presence; and, the experiment not being satisfactory to that gentleman, he was displeased with him.

Mr. Rodman, the partner of Mr. Mann, says he was aware of the decedent's belief in supernatural agencies; but the only instance he specified was a cure for fever and ague, which consisted in wearing about the neck a paper, with three words upon it—one in Greek, another in Hebrew, and another "in a language he could not tell."

To Mr. Pentz, President of the Mechanic's Banking Association, he occasionally talked on the subject of Kidd's money, gold-digging, and instruments to point out mineral deposits.

Mr. Joseph Strong—heard him converse a number of times about Kidd's money.

Mr. Smith, who occupied an office adjacent to that of Mr. Thompson, states that he had a glass in which he requested the witness to look, saying, he "would see, first, a very small, brilliant white light, which would gradually

enlarge; and then he would be able to see whatever he desired." He also exhibited his divining rod.

With Mr. Suydam, he talked in respect to Kidd's money—Mesmerism—double-sight.

He conversed with Judge Campbell in regard to clairvoyance, animal magnetism, and Kidd's vessel, divining rods, glasses for second sight; and he told him the story of digging for money at the time "he saw the devil in the shape of a large bull."

On the other hand, Mr. Whitehead, his accountant for two years; Mr. McBride, the guardian of his grandson Edward; Mr. Cox, who attended to his business for eight years, and stayed in the same house with him over nine months just before his death; Mr. Thorne, who, for several years, had met him on business two or three times a week; Mr. Whitney, an old acquaintance, and in the habit of frequently meeting him; and the Rev. Dr. Spring, his pastor for over forty years, have all been examined; and none of them, with a single exception to which I shall hereafter advert, testify to any indication of superstitious belief.

After examining the evidence for the purpose of ascertaining the frequency of his conversations on subjects connected with his peculiar views, and bearing in mind the period of time over which the testimony runs, and the degree of intimacy between the parties, I cannot perceive that he indulged in communicating his opinions on those topics more freely than is the case with men of sound mind in respect to more rational speculations; nor do his views appear to have obtained such dominant sway as to have overcome the usual proprieties of social intercourse. His eccentricity was under control, whether we regard the skepticism or the impressibility of his subjects, or the degree of familiar and confidential relation in which they stood. His counsel laughed at him about the Kidd affair, and "he seemed ever after to avoid the subject." To his pastor, the Rev. Dr. Spring, he betrayed none of his absurd notions;

and if he ever sincerely believed in all the follies stated by Solomon Davis and Mrs. Mather in respect to the philosopher's stone and spirits, no trace of it, beyond what I have stated, is to be found in the evidence of his most intimate friends. In many respects, therefore, the statements made by Mrs. Mather and Solomon Davis stand isolated. They, consequently, deserve more scrutiny.

I observe that some of the most ridiculous and extravagant absurdities attested by them, are expressed in a jargon peculiar to works on natural magic and astrology. The witness Davis testifies that Mr. Thompson referred to a book by "Francis Barrett," and said "it spoke of divining rods," and "that he could raise spirits and lay them, by that book, and cure all kinds of diseases with receipts and charms in that book." Mrs. Mather, after a long statement of the same kind of nonsense, also testifies, " *he said he got this from Francis Barrett's book,* entitled, ' Natural and Ceremonial Magic.' " It is quite apparent, therefore, that many of the most extravagant and superstitious follies detailed by these two witnesses, were not only not the product of Mr. Thompson's own mind, but he retailed them secondhand, not professing to be their originator.

It is not unworthy of observation in this connection, that Davis read in Francis Barrett's book, and Mrs. Mather's husband procured a copy from Europe, and she " looked into it enough to see what it was." Mrs. Mather thinks Mr. Thompson told her the place where he performed his experiments was the house in Columbia street, Brooklyn; and that he said he " had a house set apart, and a man consecrated for this work." Now, about this very time, Davis testifies that he lived in that house, with his wife, some few months; and he never pretends that any experiments were performed there. He had the range of the whole house except one room in the attic, which was locked; and he saw Mr. Thompson go in that apartment once. Mr. McBride says Mr. Thompson was in the habit

of visiting that house every day; but there is nothing very singular in that circumstance, as his daughter-in-law resided in the house adjoining, and Mr. Thompson visited her daily, entering her house through the door which communicated with both dwellings. There were four lots and a garden, and Mr. Thompson occasionally attended to the garden. Marshall, his coachman, says he saw linen sheetings in the parlor closet; but he also states that Mr. Kellog, the uncle of the contestants, slept in an attic bedroom, which was furnished—that the testator's grandson slept in the adjacent room; that he had been in all the other apartments, and there appeared to be nothing the decedent wished to conceal from him. Mr. Kellogg was not produced as a witness. Mr. McBride, who resided next door for a number of years, Davis, and Marshall, all fail to show anything unusual or mysterious connected with this dwelling. Nor was it entirely unoccupied. That he did not let it, or put it to a more profitable use, depended possibly upon his expectation of residing there. Davis states expressly that he said, " he had built that house for his own use, to live and die there, and nobody should ever live in that house till he lived in it. He said the reason why he did not live there himself, was because Mrs. Hunt would not go there to live with him." Mr. McBride also says that when he applied to rent it, he answered that he kept it for his own use. I think, then, that the evidence entirely fails to show that the decedent used this house for the purposes stated by Mrs. Mather. The contrary would rather appear. Why, then, did he so state to her? This may be answered in two ways. After nine years she may easily be mistaken, as to whether he asserted he *had* done, or *could* do, certain things. Much of his conversation, as related by these witnesses is expressive of his belief, and not of his actual practice; viz. that to accomplish a certain end, "you *must*" do so and so—that such a thing " *would* " happen, or " *could* " be done.

If, however, it be taken as certain that he told Mrs. Mather the Brooklyn house was set apart and used for these experiments, then the fact that it was not so used, tends to impeach the sincerity and meaning of the whole of his conversation with her. Was he indulging in idle talk, on a subject congenial to his tastes; or was he earnest in everything he said? If he misstated a fact, how much easier to overstate a belief! The same motive would tend alike to each result.

Experience establishes that some persons are fond of relating the marvellous, either for the purpose of terrifying the listener, or exciting wonder, or from a desire, not at all uncommon, to be thought strange and eccentric. We should not too hastily conclude, because Mr. Thompson chose to frighten his coachman by telling him he could obtain anything he wished by blowing a whistle; or because he told Mrs. Mather that he expected to live a thousand years by means of the philosopher's stone, that he really believed himself to be in the possession of these powers. And even in regard to his intimate friends, the expression of his views on topics of this character is to be viewed with reference to a human failing sometimes exhibited—the affectation of believing in strange and wonderful things, not ordinarily received by the mass of mankind. Rather than not be noted, some men choose to be marked for their singularity. Such singularities, it is true, are generally founded upon some predisposition in the character; and it is only the extravagant exhibition and expression that is affected. After making every reasonable allowance, however, I have no doubt Mr. Thompson's mind was impressed with a sincere belief in many absurd notions. There seems sufficient evidence to show that he believed in Mesmerism, clairvoyance, divining and mineral rods, dreams, and spiritual influences. He searched for the supposed deposits of money by Kidd, and ascribed his failure in two instances to the utterance of certain words by the

operator.   That he said he saw the devil in the shape of a bull, appears also to be well established.   He believed likewise in the efficacy of cures for rheumatism and fever and ague, as before stated.

III.   If we apply the present state of knowledge and intelligence to the opinions entertained by the decedent, they appear irrational and absurd.   What the human mind admits in one stage of its progress, is rejected in another. While many dreams in the dawn of modern philosophy, which a century or two ago were thought rational, are now regarded as follies,—the discoveries and inventions which have been the fruit of modern science might very well have been esteemed, had they been predicted at that period, as idle fancies compared with the claims of alchemy and astrology.   Little more than a century ago, the distinguished German, Stahl, whose investigations mark a new epoch in the science of chemistry, did not disdain to treat of the philosopher's stone, of the transmutation of metals, and of the universal medicine.   Lord Bacon, judging that "the world has been much abused by the opinion of making gold," said, that if one should "take a thorough view of the works of the alchemists or followers of natural magic, he might perhaps be at a difficulty which he should withhold, his tears or his laughter;" yet says, "the work I judge possible;" and proceeds to direct an experiment for the maturation of metals.   Porta, the eminent Neapolitan, the inventor of the camera obscura, three hundred years ago, described the method of finding treasures in the earth by means of the witch-hazel *Corylus*.   The story of Ponce de Leon, the Spanish adventurer, is familiar to the student of American history.   He expected to find a river in Florida by bathing in which his youth would be renewed.   This story spread so that, says Herrera, "There was not a river or brook, nor scarce a lake or puddle in all Florida but what they bathed themselves in."   The age which could reject the Copernican system on the ap-

parent contradiction of it by the evidence of the senses, put faith in the absurdities of alchemy and astrology, and in the reality of witchcraft. The British Parliament recognized the existence of witchcraft by formal legal enactments, in the reigns of Henry VII., Elizabeth, and James I. Sir Matthew Hale sat in judgment on the trial of witches; and less that 150 years ago, a woman and her young child were hanged for selling their souls to the devil.

Commenting upon Plato, and referring to various indications of the belief in the supernatural, a modern author of great learning observes, in respect to the ancient belief in ghosts and apparitions, that if ever there was a doctrine of which it could be said that it was held *semper*, *ubique*, *et ab omnibus*, this is one.

What, then, are we to say? that ideas which have existed in all ages of the world are proofs of mental disease, of a mind organically deranged? that credulity, superstition, and belief in the supernatural, are indications, *per se*, of insanity?

IV. The difficulty of defining insanity consists in the selection of a strict and proper test. The wide distance between a sound intellect and the diseased mind of the raving maniac, renders it easy to distinguish the extremes of the mental condition; but as we approach the doubtful frontier which separates madness in its various forms and shades from sanity, it becomes a nice and delicate work to draw the line between mere eccentricity, the excitement, over-action, or undue development of particular faculties, and that general or partial derangement of the intellect which arises from positive disease of the brain. The germs of fancies and antipathies, of certain habits of thought and feeling, are often sown in youth, and, instead of being corrected as years advance, develop into the most obstinate prejudice, extravagant ideas, and the widest departures from the common sense of mankind. Such aberrations are generally the result of ignorance,

and of early impressions formed in the nursery, or by the fireside, when authority and tradition are the sources of knowledge and faith, and when the moral and intellectual character is permanently moulded. To confound the results of such causes with the phenomena of mania, would erect a standard of sanity dependent on education and knowledge. The history of our race shows that intellectual culture cannot invariably be relied upon to dispel the mists of superstition. The works of the brightest lights of ancient philosophy teem with the absurdest notions on such subjects. And even at the present day, when the Christian religion, and science, have dissipated multitudes of errors, the human mind has found new fields for the indulgence of the love of the marvellous. The forms of speculative error are numerous; and if they are *indicia* of an unsound mind, who shall be the judge, when masses of men are arrayed against each other? The danger of entering into the field of speculative belief for the purpose of finding *criteria* of mental alienation, is manifest in the difficulty of agreeing as to the standard of truth. Reason, faith, and sensual perception have each their independent action. If nothing be known but what can be proved by the senses, the range of knowledge will be confined to narrow limits. If nothing be believed unless susceptible of explanation, faith is restrained in its noblest exercise. It is equally obvious that if we adopt correct reasoning as a standard of healthy action, there will be as many different conclusions as to what constitutes correct reasoning upon any given topic, as there are various opinions among mankind. Dr. Copeland describes a certain class of theomaniacs, as " characterized by an enthusiastic belief in divine selection and acceptance, and in the future eternal damnation of all who do not think as to religious matters exactly as they do ; by a belief of having received revelations from the Almighty, or of being inspired, or of holding communications with the Holy Spirit, or with angels

or saints; or by a belief of having received a mission from heaven to convert sinful men." He notes the religious excitement furnished by " revivals," camp meetings, and field-preaching, as instances of this kind of partial insanity. Dr. Lee, commenting upon this position, justly observes : " If holding the above doctrines be considered a valid test of the existence or non-existence of insanity, we fear that the number would not be small in our country who would fall under the appellation. But that a reception of the doctrines of Calvin, stern as they unquestionably are, should subject an individual to the title of insane, will hardly be conceded in a country where in some places a large majority of the inhabitants are believers in this creed. The followers of Swedenborg, now considerably numerous, who believe in holding communications with angels and saints, would also, according to our author, deserve the same appellation ; not to include some of our ablest clergy, who claim to have received a divine commission to convert sinful men." Dr. Lee concludes his remarks, however, by characterising Mormonism as a decided form of monomania.

The danger of this kind of reasoning lies in regarding as indications of radical disease, mental phenomena existing in all ages and among all classes, and dependent on natural faculties and propensities, or arising from adventitious circumstances of early impressions and education.

Being of opinion that mere speculative belief does not of itself afford a clear test of insanity, I do not esteem the peculiar opinions entertained by the decedent sufficient to establish mental derangement. This, however, is only a conclusion in the abstract, and without reference to the particular circumstances of his case. It becomes necessary to examine some special facts bearing upon the question of his capacity.

V. 1. It often happens that men entertaining absurd

ideas not in themselves indicative of insanity, evince signs of a disordered intellect in the irrational indulgence of their eccentricities to a degree destructive of the balance of the mental powers. The will seems no longer free, the predominant idea sways the mind, subverts the judgment, rules the entire conduct, and produces absurd, extravagant and foolish actions. In cases of unusual theoretic belief, it is important to inquire whether the belief has obtained the mastery of the mind, or whether it has been held in subordination to the judgment. In this connection let us, therefore, examine, as a matter of fact, how far the decedent indulged in these peculiar ideas at any pecuniary sacrifice.

Davis says that the horses about which Mrs. Hunt dreamed were exchanged at a small price, though worth four hundred dollars. He does not state how he knows the amount Mr. Thompson received; and as there was no reason growing out of the dream, why Mr. Thompson should sell the horses for less than their market value, I am inclined to receive his evidence with suspicion.

Mr. Thompson *told* McAllister, the Mesmeriser, that he had *offered* $1,000 for a mineral needle he showed him. With that exception, if it be one, there is no instance of any considerable amount of money expended in the line of these pursuits, save seven hundred dollars in the Kidd affair, for which he alleged he had some security. This is all the evidence there is of any improvident expenditure; and instead of evincing the excessive predominance of a single idea, or the supremacy of his peculiar views over the faculties of his mind, to the subversion of the ordinary rules of prudence and practical common sense, we must acknowledge that he seems to have kept his singular tastes under reasonable control.

2. The origin of the opinions of the decedent which have been made the subject of criticism, is pertinent to the question of a sound mind. If they broke out suddenly, or at an advanced stage of life, suspicion might be excited; if

we can trace them to early education, and find there a cause, they are not to be imputed to a deranged understanding.

There prevailed, many years since, no small excitement respecting supposed deposits of treasure made by freebooters in the olden times; and in reading the decedent's description of his youthful exploits in money digging, we are reminded of the legend of Wolfert Webber, rendered classic by the elegant pen of Irving. Mr. Thompson spent the first thirty years of his life in the county of Suffolk, where such beliefs prevailed. "Among the ignorant and superstitious," says Mr. Strong, his townsman and schoolmate, " there was a superstition as to Captain Kidd's money. A great many people believed it was buried there, and that it will be found some time or other. It did not exist generally among intelligent people. On an old place there were perhaps fifty holes dug in search of Kidd's treasure. They call it Money Hollow." Judge Campbell places the date of the decedent's digging for Kidd's deposits, "fifty years ago, or more," "when he was a young man." Mr. Mann says, "He lectured me repeatedly on the history of the Kidd expedition, the connection of the Livingstons with it, the cannon which he had recovered, and which lay by his door; and the cradleblanket, worked in gold, which had been given to his grandmother on Gardiner's Island, by Kidd or some of the officers. He said he had advanced little or no money in searching for the treasure, except some small loans to individuals. He told me he was born at the east end of Long Island, on Gardiner's Island I believe; that he had lived there in his youth, and had searched for the Kidd money off there."

The impressions of childhood are never effaced, and the seeds of superstitious belief then implanted, are seldom thoroughly eradicated. The familiar story of Martin Luther casting an inkstand at the devil in his cell at

Erfurt, illustrates the difficulty of throwing off entirely the influence of early education. The strongest minds often fail in the effort.

The state of education in that part of the country where the decedent passed his youth and early manhood, during the last quarter of the last century, could not have been of a very high character. With a disposition to believe in the marvellous impressed upon his mind, the pursuits of some of the natural sciences to which his tastes inclined him, readily led to speculations in alchemy and other studies that " sway the imagination more than the reason." He formed a laboratory, and acquired a " more than ordinary acquaintance with practical mechanics and chemistry." Persons of his understanding and training, are prone to magnify the influences of magnetism and electricity; and the pretences of Mesmerism and clairvoyance, the operation of charms and of divining rods, may be received under the specious form of science. In tracing the course of such follies, we can readily distinguish them from those phenomena which mark insanity.

3. At the time of the execution of the will, the decedent, says Dr. Kuypers, " placed his finger on the seal, and said, This is my last will and testament and seal; am I a deranged man, Doctor?" The Doctor also states that during the last month of his life, Mr. Thompson remarked, he supposed there were people who might deem him deranged; and that he smiled when he said so, as if in ridicule. I see nothing in this circumstance bearing against his sanity, though it is indicative of a supposition that his sanity might be questioned. Whether he so supposed, from an internal consciousness of deranged intellect,—or from conjecture that his eccentricities, coupled with the nature of his disease, might expose him to such a charge,— or because intimations had reached him from others,—may be the subject of speculation, and is not determined by the character of the remark itself. The physician having been

consulted as to his case at the time of the execution of the will of August, 1850, he may have intended his inquiry, at the time of making the last will, as an appeal to medical testimony in the presence of the witnesses called to attest the transaction.

4. Dr. Kuypers states that three or four days before the decedent's seventy-fifth birthday, which fell on the Sunday preceding his death, Mr. Thompson told him he expected to die on that day; " that none of his ancestors had ever attained over seventy-five years, with the exception of one, who had gone one day over seventy-five; and that, he anticipated, would be the result with him. . . . . He was led to that impression at a very early period of his life." I remark upon this circumstance, that the existence of such a presentiment, based on his family history, forms no test of insanity. Though his argument were bad,—though he had expressed a mere foreboding, without offering a reason, —the presentiment itself does not prove a deranged intellect. Experience and the history of the human mind, show that mankind are liable to indulge in such impressions, even without an apparent cause.

5. The disease to which the decedent was subject during the last year of his life, was one which ordinarily tends to impair the functions of the brain. , But the impression it makes on the intellectual faculties is gradual, and depends upon the frequency and violence of the attacks. Of 339 epileptics mentioned by Esquirol, in the *Saltpêtrière*, nearly one-third had no aberration of the understanding; and this institution receives chiefly old and severe cases. (*Esquirol on Insanity*, *p*. 149.) Dr. Cheyne states that he has known epileptics preserve their intellects to a very old age; and Dr. Lee mentions the case of a " scientific gentleman of extraordinary talents and acquirements," who was subject to the disease for twenty years, without any perceptible failure of the mental faculties. Mental aberration does not generally appear until after

several or many attacks, and in the course of prolonged cases. The first appearance is in an intermittent form after the seizures. The most to be inferred, then, from the nature of the disease with which Mr. Thompson was afflicted, is, that he was the subject of a malady which, though not always associated with insanity, generally tends in progress of time to enfeeble and impair the powers of the mind. This should induce the greatest circumspection and care in the examination of his case.

6. The state of Mr. Thompson's physical health, and the progress of his disease, were by no means such as to cause great bodily prostration.

In the fall of 1849, he met with an accident, as he was leading a horse down the gangway to his stable. The animal fell upon him, struck him on the temple with his shoe, and the blood gushed out of his mouth, nose, and ears. He recovered shortly, but after the injury complained a great deal of his head. He had two attacks of disease, one just previous to the execution of the will drawn by Mr. Mann, in August, 1850, and the other in December following. The former was partial paralysis, arising, in the opinion of his physician, from congestion of the liver; the latter was epilepsy. The epileptic convulsions were sudden, violent, and were usually protracted, so that he would recover partially in about two hours, and in two days, entirely. After recovering from the illness of August, 1850, he attended to his usual avocations, and was not confined to his house. The epileptic convulsions occurred at intervals of about a month, and he had none for over ten days before his decease. On one occasion he was seized with an attack while attending a meeting of the board of directors of the Mechanics' Banking Association. During the last six months of his life, he was mostly confined to his house; but in April, 1851, he attended a meeting of the board of the Equitable Insurance Company; in June or July, Mr. Thorne transacted

31

business with him at his office in Wall street; about that time, he rode once or twice to the residence of his daughter-in-law at Brooklyn; and three weeks before his death, the doctor accompanied him in his carriage to his office. During all this period he does not appear to have been confined to his bed. Dr. Gold describes his physical health as improved, ten days before his death; and at the time the will was executed, he rose from his chair and walked to the bed, where he signed it. The day of his death, Mr. Rodman found him sitting in an arm-chair, and on the occasion of his last attack he was led to the sofa and laid there.

7. Apart from the grounds upon which his general sanity is assailed, there is little if any cause for suspecting that his faculties were seriously impaired by age or disease. The most specific allegation on this point relates to his memory.

Dr. Gold and Mr. Mann both concur in saying that he stated the accident, when he was injured by the horse, to have occurred at Brooklyn, instead of New York. He was at Brooklyn when he told Dr. Gold, and pointed out an inclined plane leading to his stable there, "and, as I understood it," says the doctor, "the very place he had been hurt. It is possible he might have intended to show me that place, as similar to the one where he had been hurt; but if so, that was not as I understood it." Mr. Mann says, in respect to the same occurrence, "he told me it was at Brooklyn, repeatedly." Mr. Cox says it happened at the stable in William street, New York, but he was not present at the time. The only person who was present, was Kinney, the coachman. It may be inferred from his testimony, that the accident happened in New York, but he does not say so distinctly.

Mr. Mann states that the decedent became garrulous, and repeated the same circumstance several times, in the course of the same conversation. This is very com-

mon with persons advanced in life, and of itself is not an indication of failure of memory in essentials. Mr. Mann thinks that in the last interview he had with the decedent, on the 4th of October, 1851, when they were conversing about the trust accounts, and it was stated that the same rule of law in respect to interest which applied to the share of Cornelia would apply to that of Edward, Mr. Thompson replied, " I don't care about that, for Edward will have what is left, if there is anything left." If this implied that he had left the residue to Edward, or intended to do so, it is inconsistent with the will of May, 1851, and the will of October, 1851. It is opposed to the clearest evidences of a contrary intention, long entertained and persisted in. It must be remembered, however, that at the time of this interview, Mr. Thompson had never disclosed to Mr. Mann the contents of the will of May, nor the proposed contents of the will then under consideration, although on that very occasion he said he wished his advice in respect to its provisions.

When the will of August, 1850, was executed under the auspices of Mr. Mann, the testator did not expect to survive. That instrument was prepared in haste. He yielded on several points to the suggestions of Mr. Mann, but stated that if he should recover, he would "materially alter it," and make a " better will." During Mr. Mann's absence he destroyed it, and made another, the provisions of which he never communicated to him " in the slightest respect," and which, says Mr. Mann, " it was delicate to ask." In relation to the will of August, 1850, he stated to Judge Campbell, " a will had been made for him during his previous illness, and that when he had recovered he had destroyed it; that it was not the will he intended to make." Mr. Mann was under the impression from his conversations with the decedent, that he had executed the will of May, 1851, during Mr. Mann's absence at the South. But Mr. Mann returned from the South early in April, and the will was executed on the 13th of May, over a month after Mr. Mann's return. Mr. Mann often

remonstrated with him in respect to his feelings toward his grand-daughter; and Mr. Thompson "disliked the advice," and "was sometimes a little impatient" with him. In view of all these facts, it is evident that while Mr. Mann, in October, 1851, reasoned on the hypothesis that Edward was to take the residue as proposed in the will of 1850, Mr. Thompson reasoned on the provisions of the will of 1851, which gave Edward $20,000. This may have been the reason why he said, as to Edward, that he would have what is left, "*if there is anything left*." If we suppose he meant to imply that Edward would have the whole residue, the expression "if there is anything left," is senseless, or absurd; for an estate of a quarter million of dollars could not be swept away by a comparatively small claim. But if we suppose that he was arguing on the hypothesis that he had set aside a certain sum, say $25,000 for these grand-children, and that after deducting the amount to be paid Mrs. Quimby for interest, Edward was to have what was left, and therefore, as to him it made no difference whether the same rate of interest applied to his share, the remark is not altogether unmeaning. This view explains also the reduction of the bequest to Edward from $20,000, in the previous will, to $15,000 in the last will. It shows also, why he was dissatisfied at these claims for interest, and notwithstanding Mr. Mann's repeated suggestions that it made no difference—which, as Mr. Mann understood the will, was true—he immediately reverted to his complaints; for, as he knew the provisions of the will, and his design to give a certain sum to the grandchildren, the increase of the claim for interest diminished the legacies, and made proportionately a matter of right, what he had designed as a gift.

8. Mr. Cox states that when Mrs. Quimby resided at Portland, she sent a present to Mr. Thompson of a pair of socks. He told the witness "he was not going to wear them." He said, "there was a woman who had a hus-

band who did not treat her well, and she made him a shirt, magnetized it, put it on him, and squeezed the wind out of him. He was afraid these socks might serve him in that way—might injure him." " Mrs. Quimby sent him a present of some strawberries in 1851. I saw them on the mantelpiece with a note. I asked Mr. Thompson if he was going to eat them. He said No, he was afraid there might be poison in them, and wished me to take them to Mrs. Thompson with the note." " The strawberries were taken over to Mrs. Thompson in a wagon. Mr. Thompson and I went together. The socks I carried to Mrs. Thompson myself."

Such circumstances as these often indicate mental delusion; but if, in the face of the fact that these articles were sent by him to a person with whom he was on friendly terms, we conclude that the decedent was in earnest, then it is observable that he only expressed fear of the possibility and not belief of a fact.

VI. I pass to the general observation and opinion of the witnesses who were adduced to sustain the allegations against the soundness of the decedent's mind.

Dr. Gold saw him on the 18th of October, 1851, and details some conduct indicative, in his opinion, of imbecility; but without considering how far the facts he mentioned justified this conclusion, I find from Mr. Cuthbert's testimony, that he visited Mr. Thompson that very day for the purpose of leeching him. It is probable, therefore, that when Dr. Gold saw the decedent, an epileptic fit was impending. At such times his mind was undoubtedly affected. I lay no stress, then, on any indications of imbecility Mr. Thompson may have exhibited at that interview. For the same reason, the evidence of Mr. Cuthbert, who was called in to deplete him when laboring under attacks of his disease, affords no means of judging as to his intellect at periods of comparative health.

Mr. Cox, who stayed in the same house with the de-

·cedent for the ten months preceding the last two weeks
·of his life, says nothing in respect to his capacity, except
that he attended to business at intervals, and "sometimes
would do it very well, and sometimes not so well. Some-
times his tongue would be a little thick, and he could not
explain himself so well. In making a bargain, he was
pretty keen up to the time I left."

Abijah Mann, jun., acted as Mr. Thompson's counsel for
about seven years immediately prior to his death, was on
terms of intimacy, and had frequent business intercourse
with him. He prepared the will of August 1850. During
the summer of 1851, he saw the decedent repeatedly in
respect to the settlement of the trust of his son's estate ;
and on the 3d or 4th of October, was requested by him
to delay an intended journey to the South, in order to
advise concerning proposed alterations of the will of May,
1851. Mr. Mann expresses the opinion, that for three
years the state of his memory was not such as to enable
him to bear in mind the state of his family relations, and
his duties towards the members of his family, in respect to
disposition by will. He did not think he would have com-
prehended without suggestion and advice, the state of his
family relations and duties in regard to a disposition by
will ; but with suggestion and advice he thought he could.
I understand him to say that in his judgment Mr. Thomp-
son was " of sound mind, and capable of disposing of his
property," but "not without suggestion and advice," and
that his memory was not "always to be relied upon in
these respects, without friendly aid and advice," without
which he might make a very indiscreet will.

He expresses the opinion that " he had been growing
weaker from the time of his confinement, in body and
mind ;" his temper was more irritable ; his memory was
weak, and had been for several years previous ; he was very
garrulous, and would repeat the same story, and the same
event two or three times over in the same conversation ;

he was easily affected to tears. Sometimes there was something peculiar in his laugh.

After his first sickness in 1850, he says his mental faculties were impaired to some extent; "his memory was not as good, his temper was more irrascible ; but his faculties for business transactions seemed to me to be as good as they ever were at any period that I knew him, and for aught that I could discover when I drew the will (August, 1850), and when it was executed, he was just as competent to make a will and dispose of his property, as he was at any period while I knew him, so far as I could perceive ; and I took particular pains to satisfy myself in that respect." At the last interview he had with him, Mr. Mann states, "I thought him as competent as he had been, saving the physical debility under which he was laboring, and the more irritable state of his mind and temper." Mr. Mann also says, "his mental faculties were weaker," which he explains elsewhere by attributing it "to the prostration of his physical system." He explains what he means by Mr. Thompson's not being able to bear in mind the state of his family relations: "I mean his collateral relatives." He adds, "I don't think Mr. Thompson could have made a will at any period after I knew him, leaving his property to others than his grandchildren, and forgetting that he was cutting them off." In respect to his peculiar opinions, he says, "I should regard him when he was in good health, in all business matters, as a man of sound mind. In all matters of theoretic speculation in regard to supernatural agencies, Kidd's treasure, the history of Kidd's piracy, and the like, I should regard him as a man of unsound mind. I think he had a monomania on all those subjects."

VII. If we adopt the opinion of Mr. Mann, the most important witness for the contestants, that the decedent *was* mentally competent to make a will in October, 1851, · with suggestion and advice, then of course he had testamentary capacity. There being testamentary capacity, the

law does not regard its quality or degree, except so far as to see, in cases of low degree, that the testator enjoyed the free use of such capacity as he possessed.

It is urged that the decedent was unduly influenced in making the testamentary dispositions of his estate, by his housekeeper, Mrs. Hunt. Three witnesses speak to this point. Two of them were coachmen, who had been discharged several times at the instigation of Mrs. Hunt; one of them thrice, on his own confession, for being intoxicated, and the other at least twice, because he disagreed with her. The latter says, that in April, 1851, he refused to live in the same house with her, notwithstanding Mr. Thompson, according to his story, offered to send for a lawyer, have his will made, and leave him all his property, on condition he would return to his service. The third witness, Mr. Cox, just before the decedent's death, had a difference with him arising out of a claim of $4,000, for services, and was discharged. The will gives him $1,000, on condition he accepts it in ninety days in full satisfaction. Receiving the evidence of these witnesses, however, as unbiased, while it shows dislike on the part of Mrs. Hunt, it indicates no very *active* hostility towards the daughter-in-law and grandchildren. There is a great deal stated as to what Mrs. Hunt said to the first two witnesses; but very little, if any, reliance is to be placed upon conversation of that kind among domestics. If she had boasted much more than she did as to her conversations with Mr. Thompson, her unsworn statement would be no proof of any other fact than her boasting. Mr. Cox says that he heard Mrs. Hunt say to Mr. Thompson, when he was talking about the children, "The reason she did not like them was that they did not take any care of him, and all they wanted was his money." This is the only instance of any expression made by her in Mr. Thompson's presence in disparagement of the children. Mr. Cox stayed in the house ten months during the last year of the

decedent's life. While he was there, the will of May, 1851, was executed, and the last will, of October, 1851, was under consideration. Davis and Marshall lived with the decedent for many years. They were all inmates of the house, and possessed the most ample opportunities for observation. And yet, with the exception of the solitary instance I have specified, there is no proof of a word said to Mr. Thompson against his grandchildren, or an effort made to influence him against them in any manner.

Mrs. Hunt had been his housekeeper over twenty years; and her attentions had probably become so necessary to his comfort, that he was unwilling to part with her. She seems to have been of a prying, inquisitive disposition; and the proof indicates that Mr. Thompson resisted this, and was more inclined to keep his affairs to himself, than to gratify her curiosity. She was unfavorably disposed towards his daughter-in-law, and probably to the children; but that did not prevent Mr. Thompson's visiting the former at Brooklyn every day of his life, when in a fit state of health; nor did it, to all appearance, alienate his affections from Edward, down to the day of his death. Though greatly displeased at his grand-daughter, in consequence of her marriage against his wishes, and determined to leave her little, if anything, he continued to treat her with apparent kindness. If the housekeeper, then, ever seriously attempted to injure these members of his family in the estimation of Mr. Thompson, there is no proof that she succeeded. If it be urged that the exertion of undue influence is to be presumed from the provisions of the will, that involves the question whether no other motives can be found inducing such a disposition of his property. Testamentary dispositions otherwise inexplicable might be referred to some secret cause; and we might thus argue backwards from the will to the supposed malign influence that effectuated it. But we are not to presume base motives and bad actions, in the face of actual proof,

as to the reasons the decedent assigned for the grounds of his conduct,—unless indeed the reasons so assigned were mere pretexts without foundation in fact, or so irrational as to be unworthy of credit. How that was, I shall consider hereafter; meanwhile, I shall close this branch of the case by remarking that whatever may have been Mrs. Hunt's influence over the decedent, if exerted, it was not very successfully exercised in her own favor. By his first will, he gave her $2,000; her daughter, $1,000; and directed the surrender of a note, for $1,500, he held against her son-in-law. By the second will, he reduced the legacies to her and her daughter, one half each; and by the last will, he increased her legacy to $1,500, left her daughter's as it was before, but made no disposition of the note of her son-in-law. Independently, then, of the note, the gifts to her and her family, from first to last, were reduced from $3,000 to $2,000.

VIII. I have thus reviewed at length the several grounds urged against the capacity of the decedent, and the validity of this will. In judging of their weight, it is necessary to bear in mind that the law has adopted a very low degree of mental capacity as the standard. Idiots and lunatics are disabled from disposing of their property by will; but every person of lawful age, not embraced in these classes, is competent to make a will; and in passing upon the validity of the act, courts will not, in the abscence of fraud and undue influence, measure the extent of his understanding. Mere imbecility will not avoid a will or deed. The law "does not deny to a man of very feeble mind the right to make contracts, and manage his own affairs." "If he be not wholly deprived of reason, whether he be wise or unwise, he is the lawful disposer of his property; and his will stands as a reason for his acts." (*Stewart* vs. *Lispenard*, 26 *Wend.*, 255; *Blanchard* vs. *Nestle*, 3 *Denio*, 37; *Osterhout* vs. *Shoemaker*, *ibid.*, note; *Clarke* vs. *Sawyer*, 2 *Comstock*, 498.)

It is very manifest, then, that in testamentary cases the question is not whether the testator has made a will conformable to the views of his friends, or family. Provided he be not wholly deprived of reason, however intellectually feeble he may be, he has a right to dispose of his own property to please himself. In the absence of fraud or circumvention, so long as he is not an idiot or a lunatic, he will not be denied this right.

This doctrine is well settled. It is the rule of the statute, and of the common law, and has been sustained by our courts in the most emphatic manner.

Was the decedent an idiot or a lunatic? The witnesses for the contestants do not allege this, though certain circumstances are appealed to as *indicia* of partial unsoundness; and it is somewhat remarkable that not one of them says the decedent was incompetent to manage and dispose of his property, down to the day of his death.

IX. Turning now to the evidence in support of his testable capacity, we find the favorable testimony of associates and friends, spreading itself over the entire life of the decedent.

1. Frederick Pentz, the President of the Mechanics' Banking Association, was personally acquainted with the decedent for fourteen years. Mr. Thompson was a director of that institution, attended the meetings of the Board regularly, and took an active part in the management of the Bank. Mr. Pentz describes the decedent as " a clear-minded man in his business," and " very firm when he came to a decision," and of " strong mind."

Richard I. Thorne, the President of the Equitable Insurance Company, knew the decedent since 1819, and intimately for ten years preceding his decease. Mr. Thompson was a Director of the Company for twenty-six years, to the time of his death, and for a long period Chairman of the Finance and Loss Committee, till two years before he died. He was very regular in his attendance at the meetings of

the Board. Mr. Thorne characterises him as a man of "sound mind," "very shrewd in business, very correct in all his dealings and perfectly conscientious," "very quick in coming to a decision" and "very firm after having arrived at it."

Joseph Strong, Secretary of the Equitable Insurance Company, knew the decedent over sixty years. When they were boys they went to school together. They were in the habit of meeting daily at the office of the Insurance Company. He says, "So far as regards his money concerns, I considered him perfectly competent to manage them. In money matters he was considered rather a shrewd man. I believe he was a very decided man. When he formed a decision, I believe he was not very easily moved from it."

Mr. Smith, the decedent's broker, was acquainted with him for eight years, and their offices communicated. He transacted business for Mr. Thompson, and saw him daily. He says, he was "perfectly competent to manage his own affairs," "remarkably cautious about his expenditures and investments, all his stock investments being judicious and profitable, particularly so those made during his last sickness."

Lambert Suydam, President of the Union Mutual Insurance Company, knew the decedent for twenty-five or thirty years. He was Director with him in the Equitable Insurance Company many years. He says, "I thought he was perfectly sound in mind, and capable of transacting business." . . . "He was a shrewd man, and considered a money-making man. I think he had decision of character."

Stephen Whitney knew the decedent probably ever since he was in business in New-York, and was a Director with him in the New Jersey Railroad Company. They met very frequently. He says, "I never saw anything

to make me think but that he was perfectly sound in mind and capable of transacting any business."

The Rev. Mr. Spencer knew Mr. Thompson for seven or eight years before his death. He says, " I supposed him quite competent for the management of any financial matters or property he might have."

The Rev. Dr. Spring was the decedent's pastor forty-one years, and states that he was a regular attendant at church. In respect to the truths of Christianity, Dr. Spring says, " Few men who make no profession of religion understood them better. He took pride in defending them, . . . and by his own uniform method of reasoning—the deductions from the principles of nature to the great principles of revealed truth—for which his mind was particularly qualified." . . . " His views of God and revealed truth were clear, strong, and decided. He was of a philosophic turn of mind,—fond of reasoning in his own way, and tracing things to their causes, their relations and influences."

Mr. Whitehead knew the decedent for about two years, and visited him almost daily for a long time. He says, " I always conceived that he was a very good business man, fully able to manage his own affairs. He was not very easily moved when he had once made up his mind. He was rather positive than otherwise."

Dr. Kuypers knew the decedent for twenty years, and during that period frequently visited him in a professional capacity. He was the attending physician during his last illness. The doctor says, " I have at no time regarded him as insane." . . . " He would frequently make the remark, that there were persons who might suppose him to be deranged." . . . " I never supposed so myself. That led me to investigate his case, to see if I could discover anything of the kind, but I never observed that he was deranged."

Mr. Rodman, the partner of Mr. Mann his counsel,

knew the decedent from 1844. He says, "I suppose he was as capable of attending to his own business as any other man for whom I had done business. He was very accurate and particular in his business, so far as I observed him—very critical about his money matters."

Judge Campbell knew the decedent for upwards of fifteen years intimately, and seldom passed a week without seeing him. He says, "I always considered him a very shrewd, intelligent man, of strong mind and a strong will. He conversed with me a great deal on matters of science and new discoveries. That is, he conversed a great deal and I listened to him. He was a curious man, there is no doubt of that. He was a man very fond of talking, not only about scientific discoveries, but about curious and speculative matters."

2. It readily occurs to inquire, to how recent a period the observation of these witnesses extended; whether their intercourse was not limited during the last year of Mr. Thompson's life. I have carefully examined the evidence, to ascertain this accurately, and also to learn whether any failure of his mental powers was discovered.

Mr. Pentz visited him during his sickness, once in two or three weeks, and conversed with him on business. He says his mind was strong.

Mr. Thorne adjusted an account of premiums with him in June or July, 1851, and says he "discovered no difference as to his mind latterly."

Mr. Whitney called to see him three or four times in the course of the summer, while he was sick, and saw him a few weeks before his death. They conversed on business and general topics, and he "discovered no change in the activity or strength of his mind."

The Rev. Mr. Spencer visited Mr. Thompson twice during his illness, in the summer. The interviews were perhaps an hour long, and the conversation was on religious subjects. He "discovered no deterioration in his

mental faculties," "no peculiar failing," "no failure of memory," but thought his mind " as strong and vigorous as before."

Mr. Strong had frequent interviews with the decedent on the subject of the accounts of his son's estate.   He saw him about a week before his death.   He mentions Mr. Thompson's " perfect recollection" of some circumstance that had occurred twenty years ago, and says, " I discovered no difference in Mr. Thompson's capacity at any time.   I used to wonder that his having those fits or turns did not impair his mind.   I thought his mind good as it ever was." .

Mr. Suydam visited him twice during his sickness,—the last time two or three weeks before his death. He says, " He stated that he had it in contemplation to dispose of some of his stocks, but did not know what other use to make of his money.   We compared views in relation to financial and money matters, as we had been in the habit of doing for many years before.   He spoke so intelligently on these subjects, that I had no suspicion there was any doubt as to his mind." "I never discovered any deterioration in his faculties.  I don't think I did in the least."  " At our last interview, I discovered no difference in the strength or activity of his mental faculties, from what they had been for twenty years past."

The Rev. Dr. Spring, the decedent's pastor, called on him during his last illness, nearly once a week ; and the Saturday before he died, had an interview with him, not far from an hour long.   He says, " At the last interview his mind was clear.   He felt the force of every truth, and understood it."   He " had peculiarities of intellect, but he never exhibited any wandering in his mind.   His mind was clear to the last.   He reasoned, but he always reasoned in the same way, and nearly in the same words.   He was a rationalist, and reasoned from analogies.   He reasoned intelligently at our last interview."   " He was agitated and excited to a considerable extent on the subject of religion,

for the last two or three months of his life. He was inter-
ested on that subject for the last year of his life. Indeed,
I never conversed with him on that subject but he wept.
By agitation and excitement, I mean solicitude and reason-
able interest. There was no frenzied excitement at all.
His mind was as well balanced when talking with me on
the subject of religion, as it was when talking on the subject
of stocks. He showed no debility of mind. I think there
was nothing like childishness. I think, twenty years ago,
if he was equally sick, he would have spoken very much
in the same way as he did at our last interview. What he
said was very characteristic of him. He was a man of sane
mind. I presume his mind was to some extent sympathiz-
ing with the debility of his body."

Mr. Smith frequently saw the decedent at his house,
when he was confined. He says, " He was affected, I
always thought, by his fall some two or three years ago,
for some time after. But during his confinement to the
house,—the last four months, or the last year of his life,—
I had a good many transactions with him, and I thought
his mind was clearer than it had been previously."

Mr. Isaacs, the accountant, who received instructions
from the decedent about a week before his death, relative
to the method of making up the accounts of his son's estate,
says, " The conversation lasted about half an hour. I had
no difficulty in understanding him. He complained of his
head. As far as his conversation went with me, it was
perfectly rational, and such as a person acquainted with
accounts would use in giving directions. He was very
precise as to the mode in which they should be made up."

Mr. Whitehead kept the decedent's books, and was in
the habit of calling at the house daily. He says, "I never
had the least doubt of his being perfectly sound in mind
until the day of his death." "I do not recollect ever
observing any confusion in his ideas, or inability to talk
connectedly on any subject." In the morning of the day

he died, he called the attention of the witness to a notice, in the newspaper, of the decision of a suit in which he was interested, and requested him to send for Mr. Mann or Mr. Rodman, his counsel, to see him on the subject.

Mr. Rodman called in pursuance of this message, and remained in conversation with the decedent two or three hours. Towards the close of the interview, Mr. Thompson was seized with the attack that terminated his life; and yet, though Mr. Rodman found some difficulty in explaining to him "the exact effect of the decision on the demurrer," he gave Mr. Rodman a history of the transaction out of which the suit arose; had his papers brought, and made explanations, which his counsel took down in writing. Mr. Rodman says, "He undertook to state to me the position he occupied in that suit, and the extent of his interest in the subject-matter of the controversy,—and also the interest of the other parties,—and he did so intelligently."

Judge Campbell, who drew his will, and had repeated interviews with him, says, "I have no doubt but that he was a man of sane mind. I mean to extend that, to the whole period of my acquaintance with him."

Dr. Kuypers, his physician, says, "The condition of his mind, memory, and understanding, at the time he executed his will, was perfectly sound, I should judge." "I do not think the mind of the decedent had become weakened by his disease." "I regarded his mind as sound as could be." The day before his death, he requested the doctor to attend an exhibition of a "magnetic battery" that evening, and report to him the next day. The ensuing morning, when the doctor called, he took from his pocket a notice of the exhibition, cut from a newspaper. He adds, "He talked intelligently—strictly so on that subject. He told me he had failed in obtaining a certain power, which he thought this man had effected." Dr. Kuypers also states explicitly, that he thought Mr. Thompson fully as competent when he

32

signed the last will, as when he executed the will of August, 1850.

X. Independently of all opinions, however, there are numerous facts which bear with great force upon the state and condition of his mental powers.

1. Up to the spring or summer of 1850 he attended entirely to his own business, and made his original entries in his books regularly and intelligibly. The transactions were to large amounts and related to the collection of dividends, lending of moneys, and investments. He then engaged a book-keeper, to whom he furnished the data for making the entries. He attended himself to his collections and out-door business, until he was confined to his house, and after that, received moneys and transacted other business at home, keeping the direction of his affairs under his own control and supervision. His transactions in stocks and loans often ranged from twenty to forty thousand dollars at a time. During his sickness he made large investments in railroad bonds and stocks, through the medium and with the advice of his broker, who says, " I do not know of any injudicious investment during the last two or three years of his life." The precise statements to Mr Rodman, the very day of his death, concerning the bonds of the Long Island Railroad Company and the suit in regard to them, satisfy me, after inspecting the memorandum in writing taken by Mr. Rodman at the time, that his memory was vigorous. A proof to this point is recorded in the will itself, where we find a casual suggestion of Dr. Spring, that if he intended to remember the seamen's cause, it would be well to make some provision for good books to take to sea, incorporated into a direction to that effect.

The preponderance of evidence, then, is decisive in favor of the conclusion that whatever may have been the general condition of his mind through life, he did not manifest towards its close any increased symptoms of ec-

centricity, or any material failure of mental faculty. The strange opinions which form the basis of impeaching his sanity were as marked twenty years ago, when he conversed with his coachman about natural magic, as they were in later years; or, in justice, I should rather say they were more positively displayed, for during his last sickness they were by no means prominently exhibited.

2. If, then, he was a lunatic through life, his history is very extraordinary.

On settling in New York he engaged in the auction business, and acquired a fortune. He claimed that he had suggested the idea of the auction law, and also of the law which provided and regulated the finances of the Erie Canal.

His son Edward, on his decease, made him trustee of his estate for the benefit of his widow and children. He was allowed to enter upon that trust without objection from the other executors, or from the widow. He managed it with fidelity and prudence. He was permitted to retain the management of his own large estate, and it is conceded that no one was more able to preserve and increase it. He made large investments during his last illness, with profitable results. He was, at various times, president of the Union Bank; trustee of the Seamen's Friend Society; director of the Farmers' Loan and Trust Company, and a member of its Finance Committee; director of the Mechanics' Banking Association,—of the Long Island Railroad Company,—the New Jersey Railroad Company,—the Equitable Insurance Company, and chairman of its Finance and Law Committee,—and of the Union Insurance Company, being one of the corporators named in its charter granted in 1849. To the time of his death, he still continued director of several of these institutions. He took an active part in their management, and was regular in his attendance at the meetings of the boards.

And yet it is urged that this man was of unsound mind,

and incapable in law of declaring what disposition should be made after his death of the property he had earned, preserved, accumulated, invested, and controlled during life with prudence and sagacity.

XI. It is often useful in cases of this kind to inquire into the circumstances attending the execution of the will, and the extrinsic proof, if there be any, of the reasons given for the particular testamentary dispositions. As to the legacies in the several clauses of the will to his sister, nephews, nieces, and others, there is no manner of question that they accorded with his intention deliberately formed and persisted in for over a year, though the amounts were varied somewhat in the three wills.

There can be no doubt, I think, that the decedent's original intention was to leave his estate to his grandchildren. Davis states that he promised his son Edward, on his death-bed, that he would leave all his property to his children. He stated to Mr. Mann, his counsel, that he had promised his son "to act the part of a father to his children while he lived, and they should be his heirs and inherit his property." This, doubtless, continued to be his intention until the marriage of his grand-daughter. He was very much dissatisfied with that event, threatened to cut her off, and "asserted his entire independence to make his will as he pleased." Though he never spoke to Mr. Mann of bequeathing his estate to religious institutions, he said, when expressing displeasure at the marriage of his grand-daughter, "that he could do anything of that kind if he chose." On the 31st of August, 1850, he made his will. At that time he stated to Mr. Mann, his counsel, that he never had made any other will before this; though previously he had repeatedly told him that he had made a will, which he had destroyed when his grand-daughter got married. He proposed by the will of August, 1850, to give his grand-daughter five thousand dollars; but at Mr. Mann's suggestion he enlarged the sum to ten thousand dollars,

which was placed in trust. The general residue of his estate was given in trust for his grandson, although in January, 1849, he had stated that he did not wish a trust made for Edward. About the time he executed the will of August, 1850, he said to Mr. Mann, that "if he got better, he would materially alter it . . . would make a better will, or something like that."

Between August, 1850, and May, 1851, when he executed the second will, some time in the winter, he sent for Mr. McBride, the guardian of Edward, to call at his office, and "spoke of Edward now being aware of having a large estate, and hoped it would not spoil him, and felt pretty sure it would not, from his being under the tuition of Dr. Gold, a man who would instil proper principles into his mind."

On the 13th of May, 1851, he executed the second will. In that instrument he returned to his original intention, from which Mr. Mann had diverted him, and reduced the legacy to his grand-daughter to five thousand dollars. He placed the sum of twenty thousand dollars in trust for Edward. The general residue of his estate was given to the American Bible Society, the American Seamen's Friend Society, the American Colonization Society, the American Tract Society, the American Education Society, the American Board of Commissioners for Foreign Missions, and the New York Female Assistance Society.

The great change from the will of August, 1850, consisted in reducing his grandson's interest to the sum of twenty thousand dollars, and leaving the general residue to charitable purposes. As this feature of the will of May, 1850, was not substantially departed from in the last will of October, 1851, I think the bearing of events that transpired between May and October, has been somewhat mistaken by the contestants. These events may be looked to as indicative of motives inducing alterations of the will made in May; but the bequest to religious institutions

remained untouched in its general scope. The intention in that respect was not originated at the time of executing the last will—but was only persisted in.

The main alterations made by the will of October, consisted in taking away the bequest to Mrs. Quimby, and reducing the legacy to Edward, from twenty to fifteen thousand dollars. During the summer of 1851, Mr. Quimby made application to Mr. Thompson for a statement of his wife's interest in the estate of her deceased father. He was referred to Mr. Mann, as Mr. Thompson's counsel ; and in August he communicated with him on the subject, suggesting that it would be proper for an executor's account to be rendered to the Surrogate. The accounts were made up at various rates of interest, as Mr. Thompson had invested the funds. He was advised by his counsel that the accounts were made up improperly, and the court would probably charge him at the rate of seven per cent. semi-annually. Mr. Mann states that he complained of the injustice of this, was greatly excited and exasperated, and that he blamed Mr. Quimby "for requiring it." The counsel for the contestants urge that Mr. Thompson was under a delusion in this respect, and that, in fact, Mr. Quimby had not insisted on any particular rate of interest. But it is answered that the accounts were under consideration a long time, and it is not clear that we have in evidence all that has passed in regard to them. It does appear, however, that Mr. Quimby called for a regular account to be filed with the Surrogate. It was not unreasonable for Mr. Thompson to regard that as a demand for a *legal* account ; and on being advised that a legal account was an account at the rate of seven per cent., it was not unnatural to consider Mr. Quimby as requiring seven per cent. If this idea that Mr. Quimby required seven per cent. was a purely insane delusion, it is a wonder Mr. Mann did not contradict it, instead of palliating the matter by saying it would make no difference. In any event, there can be no doubt that the fact of having

to pay a larger sum than he expected, led to the alteration of his will.  He had, by the will of May, given his grandchildren certain sums, in view of the property they would be entitled to in their own right—and now, when he discovered their estates would be larger than he had anticipated, and the increase would come out of his own estate, he might, without vindictiveness, think it right to reduce their legacies.  Mr. Whitehead states that about a month before his death, Mr. Thompson informed him a new will was in course of preparation—that the claim presented for interest was the principal cause " of making the alterations—of making the new will."  " The idea conveyed was that the claim for interest would necessarily lessen the amount to be left to the parties by legacy; that having left the parties a certain amount, what they might claim from him in the way of interest, or extra interest as he considered it, would lead him to lessen their legacies."  The increased amount of the estates of his grandchildren, then, seems sufficiently to explain the reduction of the legacies he had left them in the previous will of May, 1851.

Why the decedent, by the will of May, left no more than $5,000 to one and 20,000 to the other, is another question.  To ascertain the motives, we must look to facts that transpired before, and not after the execution of that will.

To the time of the marriage of his grand-daughter, the decedent contemplated leaving his estate to his grandchildren.  He always expressed great dissatisfaction with her marriage without his consent.  There can be no doubt that, as to her, his testamentary intentions were changed at that time.  Nothing can be clearer than his uniform determination, she should thereafter have but a small portion of his estate.  Up to that period, he had kept the funds of his son's estate mixed with his own.  A few days before his death he stated to Mr. Isaacs, the accountant, that in the accounts of his son's estate, he had not been particular as to interest, " as he then considered his son's property mixed

with his own—and that he considered it as of no conse-
quence—that all his property would go to them—meaning
his own as well—but his grand-daughter had been stolen
from him." . "He said he had intended the whole prop-
erty for his grandchildren—that his grand-daughter had
been stolen from him, and he wished the accounts made up
giving them every allowance."

His grand-daughter was married in 1848. He at that
time began to speak of a will, and threatened to cut her off.
Shortly after, in January, 1849, he consulted with Mr.
Mann in respect to a will; and in August, 1850, he
executed an instrument by which, after the remonstrances
of his counsel, he gave her no more than ten thousand dol-
lars. Soon after this he was anxious to have the trust
accounts of his son's estate settled, and prepared himself to
pay over the funds, having $125,000 deposited in bank for
that purpose. This circumstance showed that he no longer
considered his son's estate as mixed up with his own, and
was desirous of separating the two. It is in harmony, also,
with the different dispositions he proposed to make of his
own property. The entire current of his actions and con-
versation in respect to this marriage, after effect it had
on his testamentary intentions, is consistent and uniform.
The little he ever intended she should have out of his estate,
after the occurrence of the marriage, and on yielding to
persuasion to enlarge it—and then of his own will returning
to the original amount—he finally took entirely away, when
he found that at full rates of interest her portion of her
father's estate exceeded, principal and interest, by some
fifteen thousand dollars, what he had originally contem-
plated.

But it is argued that his displeasure with his grand-
daughter was no reason for being displeased with his
grandson. That is true; and yet the exhibition of what
he may have esteemed ingratitude on her part, would
naturally lead to reflections never before suggested, on the

subject of testamentary provisions.    Mr. McBride, the guardian of Edward, states that from the time he became intimate with him, for ten years, he spoke of his grandson in connection with his large estate.  " He first endeavored, or said that he endeavored, to keep secret from him that he had so large an estate from his father as well as from himself, for the reason that he wished him to get his education before he knew what he was worth.   On one occasion, after the death of his grandson Augustus, he said that circumstance would only augment the large amount Edward and Cornelia would have; which, if they used it well, would make them very rich,—if they used it badly, would make them very miserable."   And again, " That it was enough to spoil them, or to that effect  .  . that he thought it might be disadvantageous to young people if they knew they were to have a great deal of property."   The Rev. Dr. Spring, at one of his interviews with Mr. Thompson, spoke of his grandson Edward; and the decedent said, " I intend to give him a good education, and to leave him fifteen thousand dollars. .  That  .  with the property his father has left him, when he comes of age, will be enough for him—more will ruin him."   Judge Campbell, who prepared the will of May, 1851, suggested to him that he did not propose to make a large provision for his grandchildren.    The judge states, " In relation to Edward, he said then, as he said several times, that he would have a large property under his father's will; that he himself had commenced life with but small means; and if Edward took great care of his property, he would have abundance—as much as a young man ought to have.   If he should squander his own, he did not mean he should have his property to squander also ; that his wish was to make a provision for him, which should be in trust,—as he would have his own property under his father's will at his control when he came of age,—so that in case he spent his own, he should not come to want."

Again, Dr. Kuypers states that he frequently heard Mr. Thompson say he "intended to give money for religious institutions . . months before his death." . . "He used to say, ' When I die, I will assist the poor, and do all the good I can, and give my money for religious purposes— religious institutions.'" The Rev. Mr. Spencer testifies that in July, 1851, he adverted to the fact that he had bequeathed "something to the societies in his will," naming several of them. The Rev. Dr. Spring testified that the decedent alluded to that subject at two interviews—the last, on the Saturday preceding his death. Judge Campbell states that Mr. Thompson directed the disposition of the residue of his estate by the will of May, 1851, in favor of these institutions, of his own motion, and without any suggestion on the part of the judge. · The names of most of these societies were taken from a lease of property on the Hudson River, dated November 14, 1850, for digging for Kidd's vessel, which Mr. Thompson believed was sunk at that place—the profits of which had been reserved for several of these institutions.

In respect to these bequests to religious institutions, it was insisted, on the argument, that the decedent during life had given little, if anything, in charity. That is no reason why he should not give by his last will. When a man · is compelled to leave all his wealth behind him, there is no longer a controversy between the love of possession and the duties of benevolence. He has to *select* the objects of his bounty, death leaving him no choice except as to that. It is difficult to speculate as to the motives operating in making that selection. One whose avarice had struggled successfully against charitable impulses, might, for that very reason, give more liberally, in compunction for past neglect. The idea of buying his spiritual peace with money has been attributed to the decedent, but I think unjustly. His views in favor of these institutions was not formed at the time of his last conversation with Dr. Spring.

They had been entertained for some time, had been incorporated in the will made May 1851, and were not the result of religious excitement during the period his last will was being prepared. Mr. Thompson had been a constant attendant at Dr. Spring's church forty years, twice a day. This evinced settled interest and respect, in regard to religion. The wonder in his case is, that he had not given more freely during life, rather than that he was liberal in postmortuary bounty.

Assuming that he had determined, as he distinctly avowed, to leave nothing to his grand-daughter and only a limited sum to his grandson, and recollecting that the latter was unmarried and the former had married against his will, his testamentary dispositions do not seem irrational. Edward's estate, under his father's will, on his arrival at age, will exceed $64,000,—on his mother's decease will be increased by $33,000; and adding $15,000 in trust for him, under the decedent's will, his fortune will amount to over $112,000.

XII. The preceding deductions and conclusions may thus be stated.

1. The facts do not 'establish insanity. They exhibit credulity and superstitious belief, but no delusion in respect to facts and occurrences which had no existence, except in the imagination. An eminent English judge, of great experience, has declared that he never knew a case of insanity where there was not delusion present.

2. There was no other symptom of insanity—no false perception of external objects—no mania, raving, wildness, violence, or incoherence. The memory was sound, and the faculty of attention perfect. In business and in social relations, his conduct was proper and becoming.

3. His eccentricities were under control. Self-government was not impaired, nor the balance of the mental powers disturbed.

4. Upon ordinary topics, he conversed with propriety, and argued with good sense.

5. His capacity for business was excellent, and he took an active part in the management of various important trusts and offices.

6. His peculiar views were not the offspring of a diseased imagination. They may be traced to early education and to reading. They did not originate with him, but were derived from tradition and from books.

7. These singular opinions were not exhibited suddenly towards the close of life, and when attacked by disease, but existed for many years, probably from a very early period, and when his mind was in full vigor.

8. No effort was made during his lifetime to dispossess him of the control and management of his property.

9. The large estate which he had earned and accumulated, was carefully preserved and prudently invested. He was not wasteful nor extravagant.

10. The general observation and opinion of his friends and associates were in favor of his sanity.

11. His faculties were not materially impaired during hi last sickness.

12. His testamentary intentions were not suddenly formed, or hastily carried out. At least six months before his decease, and probably much longer, he had determined to leave the bulk of his estate to charitable uses. Two wills, one executed in May and the other in October, contain the formal statement of this design.

13. These wills were prepared with care and deliberation, and after very frequent consultation with his legal adviser.

14. The numerous memoranda relating to the testamentary provisions, show a self-originating power, and will, and rational action.

15. There is no evidence of influence exerted to affect his intentions.

16. There is no proof even of suggestion, except in two unimportant particulars not affecting the general scope of the will. He himself dictated all its main provisions.

17. The instrument comports with his intentions otherwise expressed. He gave a reason for his acts: his displeasure at the marriage of his grand-daughter, the sufficiency of his grandson's estate, and his desire to aid religious institutions.

Finally, I think there is no reasonable doubt that the will propounded for proof was his will, that it represents truthfully the way in which he wished to dispose of his property—after mature reflection. In the very act of execution, he declares emphatically, " I have a right to exercise my own wish." As he was the maker so was he the disposer of his own fortune. The law treats the right of testamentary disposition with great tenderness. If questioned, it must be on strong grounds. To overturn this solemn, deliberate act, fraud, circumvention, idiocy, or lunacy must be affirmatively established. After the most thorough examination I have been able to make of the mass of testimony in this case, aided by the investigations and arguments of very learned and able counsel, my judgment is that none of these disqualifications have been satisfactorily proved ; and I must, therefore, decree sentence of probate.