# THE PREROGATIVE COURT

OF

## THE STATE OF NEW JERSEY.

MAY TERM, 1883.

———————

THEODORE RUNYON, ESQ., ORDINARY.

———————

GUSTAVUS A. HOLLINGER, appellant,

*v.*

SAMUEL R. SYMS, executor &c., respondent.

1. A testator's mental delusion as to his physical condition, or the cause thereof, does not constitute testamentary incapacity.

2. Where reasonable grounds for contesting a will exist, and the caveator's costs and expenses in the orphans court have been allowed there, a counsel fee should also be included.

———

Appeal from a decree of the orphans court of Hudson county.

*Mr. H. A. Gaede* and *Mr. G. Collins*, for appellant.

*Mr. J. C. Besson* and *Mr. F. B. Ogden*, for respondent.

THE ORDINARY.

Gustavus A. Hollinger appeals from the decree of the orphans
court of Hudson county, because it admits to probate two papers,
one purporting to be the last will and testament of his brother,
Edward N. Hollinger, deceased, late of Hoboken, and the other
a codicil thereto, and also because it does not award to him
counsel fees of the litigation out of the estate. The will is dated
and was made February 8th, 1881, and the codicil on the 14th
of March following. The testator committed suicide on the
30th of the following May. He was about forty-two years old
when he died. He was never married. His nearest relations
were his brother, the caveator, and his half-sister, Emilie, a nun
in a convent in Germany. By the will he first directs payment
of all his debts and funeral expenses, and says that the only
debt then existing against him was a loan from the First National
Bank of Hoboken to him, secured by a deposit of bonds. He
directs that his body be buried in his lot in the Hoboken ceme-
tery, at an expense of $100, and that the lot be enclosed and a
gravestone erected at an expense not exceeding $200. He then
gives to his brother Gustavus a lot of land, which he describes
as situated on the Paterson plank road, in Hudson county, in
this state, containing four and seventy-two hundredths acres,
purchased October 7th, 1868, of Mrs. Anne Vickerman, and on
January 1st, 1869, of his brother Gustave. He then gives to
August Schuberth, of North Bergen, in this state, a lot of land
which he describes as situated on the plank road just mentioned,
containing one and fifty-eight hundredths acres, purchased
August 12th, 1867, of Abram Stillwell, and adds that it is the
lot of land on which Schuberth then resided. He provides that
in case of Schuberth's death before his (the testator's) decease,
the property should go to Schuberth's children surviving the tes-
tator. He gives Schuberth any arrears of rent therefor, as a tes-
timonial of Schuberth's friendship for and kindness to him. He
next gives to John Ludwig Weber, of North Bergen, with like
limitation over in case of Weber's death before his own decease,
another lot of land, which he describes as being on the plank
road, and containing one and six hundred and fifty-nine thou-

sandths acres, purchased December 10th, 1866, of Abram Still-
well. This gift he makes as a testimonial of Weber's "honesty
and straightforward character." He then gives to Mrs. M. E.
Charles, of Hoboken, in case she should survive him, $250,
with whatever furniture and clothing he might leave, as a testi-
monial of his friendship for her, and for her care of him while
he was sick at her house ; and provides that in case she shall not
survive him, the gift shall lapse and go to his residuary estate.
He then gives to Louis Ernst, of the city of New York, in
trust for Ernst's three children, whom he names, to be paid to
them as they respectively attain to majority, five shares of stock
of the New York Gaslight Company, in proportions which he
specifies, and provides that in case he should dispose of the stock
before his death, there be substituted, in place thereof, $500, to
be distributed in the same proportions. He also provides that
if either of the children should die before attaining majority,
the decedent's share should go in equal shares to the survivors
attaining majority. He then gives to Mrs. Marie Deck Bishoff,
of Alsace, his cousin, and to her children surviving him, one
first-mortgage seven per cent. $1,000 bond of the Toledo, Peoria
and Western Railroad Company, and one first-mortgage seven
per cent. $500 bond of the North Hudson Railway Company,
substituting $1,500 in place of those bonds in case he should dis-
pose of them before his death. He then makes to Josephine
Deck, of Alsace, his cousin, the sister of the last-named legatee,
a like bequest of like bonds, with like provision for substitution.
He then gives, devises and bequeaths to his sister, Emilie Hol-
linger, known otherwise as *Sœur* Marcienne Hollinger, of Por-
tieux, France, and her heirs, all the rest and residue of his
estate, real and personal, and all claims, present and reversionary,
to the balance of the estate of his father, Aloys Hollinger. He
then says he thinks it wise to state that the rest and residue of
his personal estate and personal property, exclusive of real estate,
after deducting the executor's fee of $500 thereinafter mentioned
and provided for, and the payment of his loan from the First
National Bank of Hoboken, and funeral expenses, as therein-
above provided for and directed to be paid, then consisted of

$4,500 of North Hudson County Railway first-mortgage seven per cent. bonds; $1,000 of Toledo, Peoria and Western Railway seven per cent. bonds; $500 of Wabash Railway Company six per cent. bonds; ten shares of Mobile and Ohio Railroad Company stock, and one share of Chesapeake and Ohio Railroad stock. He then appoints Samuel R. Syms, president of the First National Bank of Hoboken, executor of his will, and requests him to accept a $500 North Hudson Railway Company seven per cent. bond in full payment of his services and commissions and expenses and surrogate's fees, if he can possibly do so. The will concludes with the following provision

"The above devises and bequests are made on the express condition that if any of the said devisees or legatees contest or dispute this will, either in the probate or execution, or carrying out of the same, or any of its provisions, or cause the same, the execution or carrying out of the same, to be contested or disputed, then I do revoke and annul the devises and bequests to such devisee or legatee herein made."

The will was drawn by Mr. John H. Stitt, a lawyer of New York, who was well acquainted with the testator, and with whom he had had business transactions, as representing Louis Ernst, manufacturer of pianos, or his firm of Ernst & Lighte, and also one, at least, on his own account, the drawing of an agreement between him and his brother. The instructions for the will were given by the testator himself, both verbally and in writing, and his written memorandum for the will is produced. He was otherwise careful as to the testamentary disposition he was about to make, requesting Mr. Stitt to ascertain what was the law of New Jersey in regard to aliens and kindred of the half-blood. He made a careful bargain with Mr. Stitt as to the price to be paid for drawing and superintending the execution of the will, and also as to the time when it was to be ready for execution. Mr. Stitt says the testator was anxious to have it drawn as soon as possible. At the appointed time he went to Mr. Stitt's office, and the will was handed to him by Mr. Stitt. He took it into an inner office and read it over and approved it, and it was then executed with all due formalities. He then paid

for it and took it away with him. The testamentary witnesses were Mr. Stitt and Mr. Charles S. Phillips, managing clerk of Mr. Stitt's law firm of G. S. & J. H. Stitt, and Mr. Giles F. Bushnell, a lawyer of New York, who happened to be present. Mr. Phillips had known testator for about five years, but Mr. Bushnell had had no acquaintance with him. Mr. Stitt gives it as his opinion that from the time he brought the memorandum until after the will was executed, the testator was of perfectly sound mind.

He also says, in his answer to the question whether, in all his business transactions or conversations with him, he saw anything that might look like unsoundness of mind, that his opinion is that he was perfectly sound in mind; that he was impetuous in temperament, but there was no unsoundness of mind. He also says that in explaining what he wanted, in giving instructions for the will, he seemed to have no hesitation at all, and appeared to be very clear and decided as to what he wanted. Mr. Phillips says, speaking both of the time of drawing and the time of executing the will, that his conversation, which he overheard, in regard to the drawing of the will, was perfectly clear, and he seemed to have full control of all his mental powers; and he also says that he has no doubt that the testator understood perfectly what he was doing when he executed the will, and that from what he saw of him he had no doubt of his entire sanity. He adds that he regarded him as of a somewhat excitable temperament. Mr. Bushnell, who, as before stated, had had no previous acquaintance with the testator, says it was in a very distinct manner that he published and declared the instrument to be his last will and testament.

The codicil appears to have been drawn by the testator himself, for the purpose of making a slight alteration in the will.

The reason for it is given in his letter to Mr. Syms, dated May 17th, 1881, a short time before his death, in which he says:

"I have made one change in it [the will] in April or March, because Weber did not treat me right. Had he not made or tried to make an extortionate charge for the few days' attendance on me [in his sickness] there would have been no change. I want my sister to get the money I left her. The poor girl

is entirely disinherited by my father, she did not even receive the little money belonging to her from her mother's estate."

The codicil is as follows :

" For various reasons, which appear good and sufficient to me, I hereby set aside, revoke and annul the bequest mentioned in the fourth article of my will to John Ludwig Weber, or to his children, to a certain plot of land, containing one and six hundred and fifty-nine thousandths acres of land, as said in said fourth article, and direct that said bequest shall revert to my sister and residuary legatee, Miss Emilie Hollinger."

The witnesses to the execution of it were Eugene Brem, Louis Schwehm and Theodore Ernst, all of New York. It was executed by the testator in their presence, and without any professional aid. Schwehm says that he had known the testator about twelve or fifteen years; that the name of the testator, to the codicil, is in the testator's own hand, and he recognizes his own signature to the paper as a witness. He further says that when he signed, there were present Ernst and his sister, and Brehm and himself, and the testator; that the testator signed in the presence of all the witnesses, including himself, and said, "I want you to look that I am signing my name here," and that they all did look; that then, after the testator signed his name, he asked the witness to sign the paper, and he did; that the testator told him he wanted to make a little change in his will on account of some land he wanted to put over to his sister ; that the testator read the certificate of the witnesses at the bottom to them, and that it is correct as he read it; and that the testator signed in the presence of all of the witnesses, and that they all signed in his presence and in the presence of each other. He further says, in answer to the question whether he considered the testator, when the latter signed the codicil, a sane man, understanding perfectly what he was about, "Yes; just every bit of it; he read it to us and told us to sign our names." Brehm testifies that the testator wrote his name to the codicil in his presence and in the presence of Schwehm and Miss Ernst; that the testator was present when the three witnesses all signed, and they were all present when each one signed. He says the testator informed

him of his object in making the codicil—to give the land he had given to Weber, in the will, to his sister. He also says that the testator read to him the certificate which the witness signed, and that the certificate was a correct statement of what took place in the execution of the paper. He says that he had known the testator two or three years, and that the testator called him in to sign the codicil through friendship. Miss Ernst testifies that the testator said he wished the witness to sign a little alteration that he was making in his will. She recognizes her own name and says she signed the codicil as a witness, and that the testator signed it in her presence and in the presence of all the others, and that they all signed in his presence, and that each signed in the presence of the others.

In his book of accounts (it may be observed) the testator entered the payment of the fee to Mr. Stitt for drawing his will, and the names of the witnesses to the will. The method, care and prudent circumspection exhibited by the testator, not only in the disposition of his estate, but also in providing, as far as he could, against the contest, which, it appears from his correspond-ence and other evidence in the cause, he apprehended his brother, the caveator, would make to defeat that disposition, are such as to indicate the possession, not only of that degree of capacity which is in law regarded as sufficient for the disposition of one s estate, but also of business qualifications of a high order. And here it may be said that the evidence shows clearly that he was not only a skillful book-keeper, but was unusually accurate in his book-keeping, so that in the establishment in which he was employed in that capacity for many years, his results were accepted as being undoubtedly correct as they came from his hands. He was also a careful and useful confidential clerk of the same house, jealous of their rights, and particular and persistent in securing them. It may be added that after he ceased, on account of his health, to engage regularly in business, he continued to be employed by Mr. Ernst, or his firm, in superintending their book-keeping ing and attending to their difficult collections, especially in this state, and he was so employed up to the time of his death. On the 12th of February, 1881, four days after his will was made, he

wrote to his sister Emilie, stating that he apprehended liability to sudden death, and that, under those circumstances, he had made his will, and had placed it, with his securities, in the Mercantile Safe Deposit Company of New York; that he had named Mr. Syms, the president of the First National Bank of Hoboken, as his executor; that, by the terms of the will, he had given to her securities of the money value of about $6,000, stating them particularly, and one and sixty-five hundredths acres of land, and also the amount still due him (stating the investments) in remainder from his father's estate, and also whatever money Mr. Schwartz might have. He adds that it may be necessary to pay a few expenses out of the property given to her, although he leaves nearly enough money in bank for funeral expenses &c. He then proceeds to state the rest of the dispositions made in his will.

On the 4th of May, 1881, in the same month in which he died, he wrote a letter to Mr. Syms, in which he says that, thinking it unlikely that he can live long, he would notify him that his securities at the Mercantile Safe Deposit Company were as follows, and then proceeds to state them in detail: $4,500 North Hudson Company bonds, $3,000 Toledo, Peoria and Western first mortgage, $500 Wabash bonds, five shares New York Gaslight Company stock, ten shares Mobile and Ohio stock, one share Chesapeake and Ohio first preferred stock, $494.40 note of C. M. Murch, due September, 1881.

He adds that his desire is that in order to pay off his loan of $2,800 from Mr. Syms's bank, Mr. Syms should sell the $2,000 Toledo, Peoria and Western bonds in his possession, worth, as he says, $116, and then adds—

" $2,000 @ 116.............................................................................. $2,320
  Note of Murch......................................................................... 494
                                                                                    ————
                                                                                    $2,814 "

He further says:

" I have some money on deposit ($138.87) in the Hoboken Savings Bank, and $55.18 in the Citizens Bank of New York. My only debts are about $5 for

medicines, and for twenty-three visits of Dr. Chabert, for which he said he would charge $1.50 each, and fourteen visits to his house, calling an average of ten minutes each."

In another letter of the 17th of May, 1881, to Mr. Syms, the one already referred to, in which he mentioned the change in his will by the codicil, he says, referring to his weak physical condition, that he feels as though it might be possible that he might die at any day; that it had come to his knowledge that his brother, the caveator, meditated, in case of his death, contesting his will (which, he informs Mr. Syms, is in the keeping of the Mercantile Safe Deposit Company), on the plea that he was mentally unsound when it was drawn. He says that a horrible story was got up by Dr. Chabert when he first called on him, and he attributed it to the fact that (as he insists) the doctor did not understand his symptoms. He proceeds to say that in case anything happens to him he wants the letter to appeal to the feelings of any judge or jury, in case there should be a contest of his will, not to set it aside because an expert may come with his want of knowledge of the symptoms of disease. He says expert testimony is worthless, and he therefore encloses the names of people who had seen him since he made the will, and with whom he had talked, and who would testify that they never saw anything wrong in him since the day he was taken sick. Then follows, after his signature, a long list of persons, with the business which he had transacted with them, or the other opportunity which they had had of observing his mental condition.

The evidence is plenary, from all the indications and facts and appearances on which reliance is ordinarily placed for ascertaining whether testamentary capacity exists, that at the time of making the will and codicil the testator was fully competent to transact the business in which he was engaged. He knew what his estate was, what the claims of others were upon him, and what disposition he desired to make. What he did was done with deliberation, and after mature and careful reflection. It may be added that it is not usual to find so many and cogent proofs of

thoughtful discrimination in the disposition of an estate by a testator.

The caveator insists, however, that the testator was of unsound mind, and that one phase of his insanity was an unreasonable and unfounded prejudice against him, which displayed itself in the testator's disposition of his estate by the will and codicil under consideration. In the first place, the evidence of the caveator himself leaves no room to doubt that the relations between him and the testator were by no means such as to create any suspicion as to the testator's capacity from the smallness of the testamentary gift to the caveator. It appears clearly, from all the testimony in the cause, that the testator not only distrusted his brother but regarded him as having defrauded him. For years the testator refused to speak to him, and they were mutually angry with each other.

The caveator says, in his testimony, that between 1878 and 1880, for nearly two years, they hardly spoke to one another. He also says that in 1868 they bought some property on the Paterson plank road, and then had some little misunderstanding ; that he first bought one piece, and they then bought another on joint account between them ; that the testator bought a third piece, and the pieces were all about equal in size ; that the testator desired that his brother's piece, which lay in the middle, should be divided into two equal parts; that he did not consent to it, and that the testator made a great deal of fuss and trouble until he finally consented, and divided it, as the testator desired, on the 1st of January, 1869 ; that after that they remained on very friendly terms ; that in 1877 he was in financial embarrassment, through speculation, and concluded to accept an offer that the testator made him, to move to Hoboken and take a room from him in the house in which he lived ; that the testator agreed to let him have the room for nothing in case he could not get along, or for $2 a month in case he could get on ; that the testator collected his rent from him from the beginning ; that he had not lived in the house more than three months before the testator came to him one day and wanted him to move, and insisted upon

his going out, and that he refused to leave until his year was up, but, at the end of eleven months, moved out.

He says that he had nothing of any account to do with the testator until 1880; that he might have seen him once or twice, just bidding him the time of day, but had no intercourse with him until 1880, after his father's death occurred, which was on the 30th of June, in that year. The father died in Germany. On the 9th of January, 1881, they met at the house of George G. Sturges, and the testator then not only refused to speak to the caveator, but declined to eat at the same table with him. They met on the 18th of the same month at an auction sale in New York, but the testator refused to recognize the caveator, and they passed each other without speaking. On the 11th of February following they met in the street in Hoboken and the testator refused to recognize him.

Towards the end of the testator's life, later in February, 1881, the caveator called to see him, the testator then being sick, but the latter at first refused to see him, though he subsequently consented, and from that time their relations were seemingly friendly, and the caveator, from thence to the time of the testator's death, frequently visited him. But that the reconciliation was only an apparent one is evidenced from a letter written by the testator to his sister, dated May 17th, 1881, only thirteen days before his death, in which he refers to these visits, and says:

"Gustave has been to see me every day, generally twice. My principal object in writing this letter is the following: I told him that I had written to you two weeks ago that I feel very sick. I have been told that he has said to another that he at once wrote to you saying that I was better, because he was afraid that if you thought I was very sick you would write to the Catholic monastery to come and see me, and that I would leave my money to them. I will explain this. Last January, when I had my quarrel with him, I told George Sturges that I would sooner leave my money to the Catholic monastery than to him. That remark was repeated to him, and he knows I have made a will. He has tried to find out what it was from me, but I would not tell him. But he has told different people that he should contest any will that did not leave all my money to him. * * * I know now one thing for sure—Gustave is after my money."

He further says, in the same letter, referring to his health:

"A change may come at any moment, but above all I am sorry that I am not in Europe near you, so that nothing could prevent my will from being executed. I want my money to be divided exactly as I have directed, and I want you to keep this letter, and I have written it as a further safeguard in case anything further happens to me, for I now know for sure Gustave would contest my will. I have written this letter very slowly, for I am weak bodily but not mentally. I hope you never will have occasion to use it, for I want to live if possible."

After some further statements in regard to his health, he says :

"I have burned up all of your letters and those of my dear aunt, and many of my private papers. The next letter I receive from you I shall read and then burn, unless I feel better. I do not wish Gustave to know what you write to me, or what I write to you."

And here, it may be said, Mr. Syms testifies to what the testator said touching his relations to his brother. He says that one day, in the bank, the testator either said he had made his will, or was about making it, and wished him to become his executor ; that he at first declined, because he had too much business to undertake such a matter, and asked him if he had no relative who could act as his executor, that that would seem more proper ; that he replied that he had no relatives in this country except a brother, with whom he was always quarreling, that he could not get along with his brother at all, and would not have his brother to have anything to do with his affairs ; that he hoped to get through with the sickness, that he had a very good constitution, but would like to prepare his business matters for any emergency, and consequently was making a will, or had made a will, and wished Mr. Syms, very particularly, to act as his executor, as he had no one else that he wanted to trust his business with ; and thereupon Mr. Syms says he let it stand as it was. He says the testator spoke again about his brother, and said he wished him (Syms) particularly to act, because he was afraid his brother would oppose his will, and he wanted him as a disinterested, unbiased person to take charge of his property and see that his will was carried out to the letter.

The caveator has put in a letter written by the testator to him, under date of January 6th, 1881, which not only shows conclusively that the testator was in full possession of his mental faculties so far as all business transactions were concerned, and was a man of unusual shrewdness, but that the relations between him and his brother were those of hostility and not of friendship, and that the hostility was due to resentment. The letter is a very long one, and is devoted to a review of their mutual transactions, setting them forth in detail so far as was necessary, either to justify the action of the testator which his brother had complained of, or to justify his own complaints of the conduct of his brother therein. It is bitter and ironical, and evidently was intended by the testator as a full expression of his sentiments to and towards his brother in reference to their mutual dealings, and he adds a postscript urging his brother not to consider the letter a private one, but giving him his full permission to show it to all his acquaintances. It may be remarked here that the gift to the caveator in the will is of the land on the plank road which is mentioned by the caveator in his testimony above quoted.

It is urged, on the part of the caveator, that the prejudice or dislike just referred to, was without cause, and wholly unjustifiable, and that it was due to a delusion on the part of the testator in reference to the conduct of his brother in a transaction which took place when they were boys, in which the testator's father gave him an unmerciful flogging with an unusually severe instrument; that the testator charged his brother with having informed his father of the fact that the testator was in the possession of a sum of money which he had found, and which he had been spending for trifles, and his father, through a belief that the testator had come by it unjustly, gave him the beating. But it is quite clear that the testator's dislike of his brother had a different origin, although that circumstance was not without its weight.

It also appears that the transaction and his brother's conduct therein were no figment of his imagination, but were actualities.

The letter just referred to shows causes of the dislike, but makes no reference to the flogging or the caveator's connection

therewith.   It is a reply to a letter from the caveator dated two
days previously, and designedly omitting the ordinary civilities
of correspondence, it begins with the statement that the testator
will take the trouble to answer that letter, as, otherwise, the
caveator would confirm himself in the many false statements and
suppositions that it contains.   But as was said by this court in
*Dale* v. *Dale, 9 Stew. Eq. 269,* it is obviously not for the court
to annul a testator's disposition of his property by will on the
ground that he has unequally or unjustly divided his estate, or
capriciously or through prejudice given it away from those who,
in view of his natural or social relations and obligations, have
undoubted claims upon his bounty or his justice, and bestowed it
upon less worthy, or even upon absolutely unworthy objects.   It
is enough to say that in the case in hand there appears to have
been dislike and distrust not arising from delusion on the part
of the testator towards his brother.

It remains to consider whether the testator's testamentary ca-
pacity was affected by what are regarded as his strange, if not
insane views and convictions in regard to his physical condition,
and the cause thereof.   He appears to have been of opinion that
a result of the castigation before referred to, given to him by his
father (he was then only about eleven years old), was a great
and radical change in his physical constitution.   He entertained
the idea that one-half of his body did not perform its functions;
that he breathed only with one lung; that only one-half of his
heart performed its operations, and so on.   It is stated that he
referred to himself as a double man, sometimes saying that one-
half of him was, as it were, dead, and the other half alive.   He
was given to excessive dosing himself with purgative medicines,
bought Brandreth's pills by the gross of boxes, and took them
constantly with a view to the improvement of the condition of
his blood.   On one occasion, when he was sick, he thought he
ought to be bled, and the doctor having deferred the operation,
he undertook to bleed himself in the wrist, cut an artery, and
well-nigh bled to death; and he was addicted to an evil practice
eminently deleterious to physical and mental health.   He made

Hollinger *v.* Syms.

no concealment, in his conversations with his friends, of his ailments or the practice referred to.

He had theories of his own as to his disease and the treatment from which relief might reasonably be expected, and he deferred but little, if at all, to the judgment of his physician in that respect, insisting that the latter misunderstood his complaint.

No one can undertake to say that he had not the pains and sensations of which he complained. It is beyond all question that, for a long time before his death, which, as before stated, took place by suicide, he was afflicted with sleeplessness, which appeared to defy all his efforts and those of his physician to overcome, and it apparently was this that caused him to take his own life. His physician, Dr. Chabert, basing his judgment wholly upon his observation of him in reference to his complaints, and his theories in regard to them, says that he regarded him as a monomaniac on that particular subject. At the same time he says, with regard to the practice before referred to, that he does not think that it had made any inroad on his nervous or muscular system at all. And here, it may be observed, that when Dr. Chabert proposed the removal of the testator to a lunatic asylum, the caveator objected, and refused to act upon the proposition, on the ground that the testator was not insane. The caveator then said that the testator had talked as he then did, from illness and not from insanity, all the years he had known him.

There can be no doubt that at the time of making the will and codicil, the testator was sane in every other respect, whatever may be said of his theories in regard to his physical condition and the cause of it. In all his transactions up to his death he was honest, exact and methodical, and was careful, observant and prudent. His observation and attention to those things which affected his own estate were extraordinary. Mr. Syms says that during the time that he transacted business with their bank, which was up to the time of his death, his mind seemed clear, and he was very intelligent in his conversations on railroad stocks and bonds, and that he showed that he knew more about them than

the witness did; that he had studied them more closely. He also says that he found the statement made in the testator's letter to him concerning his property very precise and careful; that his papers were in very nice order, everything folded up and endorsed, with dates on them; that they were mostly old papers; that some of them were deeds, and that his securities were in envelopes. His book of accounts, which has been before referred to, was exceedingly well kept, neat and methodical, and he was employed by Mr. Ernst or his firm up to his death in that sort of business which necessitated the possession of more than ordinary skill, intelligence and shrewdness. Up to his death those with whom he dealt and with whom he was brought in contact, not only had no suspicion that his mind was disordered, but, on the contrary, dealt with him, or would have done so, without hesitation, in the gravest transactions of life. The caveator, in his testimony, gives as the grounds of his belief in his insanity his conduct towards him, which has already been considered, and the speculative opinions which he entertained in regard to his physical condition, but the caveator himself dealt with him as an entirely sane man. He entered into an agreement with him in regard to their father's estate—the agreement before mentioned as having been drawn for them by Mr. Stitt. The letter of January 6th, 1881, written by the testator to his brother, was in reply, as has been before stated, to a letter dated two days previously from his brother to him. And not only did not the caveator ever deal with or treat the testator as being of unsound mind, but, as before stated, when Dr. Chabert proposed to remove him to a lunatic asylum the caveator objected, and refused to take any action in that direction, on the ground that he believed that the testator was entirely sane.

It is scarcely necessary to remark that erroneous views in regard to medical theories and the causes of disease, however visionary they may seem, surely are not incompatible with the possession of testamentary capacity. In *Stackhouse* v. *Horton, 2 McCart. 202,* it was held in this court in 1854 (B. Williamson, ordinary), that the existence of monomania in a testator who is otherwise sane, which does not affect the disposition made by the

will, will not invalidate the instrument. And the same result has been reached in England in a recent thoroughly-considered case. *Banks* v. *Goodfellow, L. R.* (*5 Q. B.*) *549.* There the will was made December 28th, 1863. It was beyond dispute that the testator had at former times been of unsound mind. He had been confined as far back as 1841 in a county lunatic asylum, and though he was after a time discharged therefrom, he remained subject to certain fixed delusions. He had conceived a violent aversion towards a man, and, notwithstanding the death of that person, he for years afterwards continued to believe that he still pursued and molested him, and the mere mention of that man's name was enough to throw the testator into a state of violent excitement. He frequently believed that he was pursued and molested by devils or evil spirits, whom he believed to be visibly present. Besides these delusions, which were proved by two witnesses who were above suspicion, his physician and the clergyman of his parish, there was a body of evidence which, if believed, was strong to establish a case of general insanity. From September, 1863, he had a succession of epileptic fits, and a blister was applied to his head, and the physician who attended him throughout that period testified that his mental power, such as it was, suffered from the fits, and that he considered him insane and incapable of doing business during the whole time. On the other hand, it was proved that the testator attended to and managed his own money affairs (which were not large, however), was careful of his money, and showed business knowledge and tact (but not to any extraordinary degree) in the management of his affairs, and exhibited intelligence in the instructions for his will and the execution thereof. There was a verdict sustaining the will. A rule to show cause why the verdict should not be set aside as being against the weight of evidence was granted, but, after argument, was discharged, the court holding that the verdict must stand, seeing the testamentary disposition was not affected by the delusions which, as before stated, were that the testator was pursued and molested by evil spirits, and that a man long since dead came to molest

him. See, also, the case of *Thompson* v. *Quimby, 2 Bradf. 449, 21 Barb. 107.*

I am clearly of the opinion that the will and codicil in question should be admitted to probate as the true last will and testament of the testator. The decree of the court below will therefore be affirmed so far as the admission of the instruments to probate is concerned.

The decree granted to the caveator costs and expenses of the litigation out of the estate, but gives him no counsel fee. The orphans court, by the decree, expressly and properly adjudge that he had reasonable cause for contesting the validity of the will and codicil, and therefore awarded him payment of his costs and expenses out of the estate. On the same ground he was equally entitled to payment of his reasonable counsel fees. The decree will be modified in that particular, and a counsel fee of $500 in the orphans court allowed to him out of the estate. He will be allowed costs of the appeal, but no counsel fee in this court.